**BEAZLEY v. ALLEN, Collector of Internal Revenue.**

No. 308.

District Court, M. D. Georgia, Macon Division.

Aug. 16, 1945.

John A. Sibley, of Atlanta, Ga., and James Mann, of Norfolk, Va., for plaintiff.

John P. Cowart, U. S. Atty., and Chas. W. Walker, Asst. U. S. Atty., both of Macon, Ga., Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe and Mills Kitchin, Sp. Assts. to Atty. Gen., for defendant.

LOVETT, District Judge.

F. W. Beazley, the plaintiff, having paid additional income taxes assessed against him for the year 1941, and having unsuccessfully sought a refund, brings this suit against the Collector to recover the taxes and interest, alleging the tax was illegally exacted.

The plaintiff, his wife and son filed separate federal income tax returns for the calendar year 1941 and each paid the taxes reported therein respectively to be due. A subsequent investigation and audit of plaintiff's return by the Commissioner of Internal Revenue resulted in the assessment and collection of the additional tax, the Commissioner being of opinion income returned by the wife and son in reality was either his or under his control, and was beneficially enjoyed by him.

The issues are submitted to the court for determination, a jury having been waived.

The question presented is whether plaintiff was taxable on the interest on certain securities purchased and pledged to secure a loan in his own name, or whether this income was taxable equally to him, his wife and his son. The answer to the question is controlled by whether he singly or they jointly owned certain bonds, stocks and note of the Southern Ice Company, Inc., of Dallas, Texas, and of certain stocks of affiliated ice companies. Plaintiff claims they were bought and pledged pursuant to the terms of a family arrangement made in 1939 in which the plaintiff was authorized in writing to purchase the securities for the three in equal shares and to finance the acquisition through a pledge thereof, in his own name alone, which arrangement was undisclosed until 1941 for reasons which will be discussed.

The facts are practically without dispute. They may be summarized, as I find them, in this way.

### Facts.

Plaintiff at the time of the purchase was and still is a well known and successful executive in the ice manufacturing business. Since 1930 he has been successively president and chairman of the board of directors of the Atlantic Company which owns and operates ice factories, cold storage plants and refrigerating units in seven southern states. In 1939 he was receiving an annual salary of $40,000 for his services in that capacity. At the time, however, due principally to certain reverses in real estate speculation, plaintiff was insolvent and owed $90,000 in excess of the then value of his assets. The separate estate of his wife, at that time, consisted of her home in Atlanta, Georgia, which he had given her and which had a value of approximately $30,000. The estate of his son consisted of an equity in his home in Atlanta worth approximately $6,000.

In 1936 the Associated Utilities Corporation and allied companies, holders of the securities having voting control of the Southern Ice Company, Inc., had sought to interest the plaintiff in the purchase of these securities at a substantial discount, but he had advised them that he was not interested although he did visit some of the operating properties and consulted with the representatives of the owners of the securities relative to the management. In 1938, being importuned by his wife and son to establish the son in business, and to that end to purchase an interest in some company of which he was not a managing executive (his son having found his advancement retarded in the Atlantic Company because of being his father's son), he agreed to again communicate with the owners of the securities of Southern Ice Company and ascertain whether they were still anxious to sell. His inquiry resulted in negotiations for the purchase of the properties, and in 1939 it was virtually agreed between plaintiff and the owners of the securities that they would sell, the purchase price for all of the stock and underlying securities to be $1,000,000, payable $750,000 in cash with the balance to be paid in three years, the payment of which was to be secured by a second mortgage on the securities acquired. Something in the nature of an option was given to the plaintiff on these terms. The necessity for selling was that the securities were owned by a Holding Company and under the Public Utility Holding Company Act of 1935 could not be retained. 49 Stat. 820, 15 U.S.C.A. § 79k.

An agreement was reached shortly thereafter between plaintiff and the First National Bank of Dallas, Texas, whereby the bank agreed to lend plaintiff the necessary $750,000 cash to be repaid in three annual payments of $250,000 each to become due respectively on October 30, 1939, 1940 and 1941. Notes, negotiable in form but not under seal, were later executed for the loan. This loan was to be secured by a first mortgage on all the purchased assets. This contract was in writing and is sometimes herein referred to as the triparty contract. Similar notes were to be given to the seller of the securities for the balance of the price, secured by a second mortgage on the securities sold.

A few days after these agreements and arrangements were tentatively completed plaintiff sought the advice of his attorney in Atlanta, a member of the bar of high standing and capacity, respecting the legality and effect under the Internal Revenue Laws of a family partnership consisting of himself, his wife and his son. Pursuant to his attorney's assurance of the legality of such an arrangement if entered into in good faith, though his attorney at the same time informed him that the Treasury Department looked with disfavor on reduction of tax liability in this manner and would scrutinize with great care any contract that might be entered into, a family partnership contract for the purchase and ownership of the Southern Ice securities was drafted, and later, on April 21, 1939, was executed by the parties, under seal. They were fully informed as to its meaning and effect and the exposure each was making of his individual assets to liability if the purchase turned out to be unprofitable.

The contract provided, in part, that the plaintiff, his wife and his son each agreed to buy the securities of the Southern Ice Company and affiliates in accordance with the terms of the agreement already tentatively reached between the plaintiff and the owners of the securities and the Dallas bank, with each partner to have one-third interest in the property purchased and with each to become liable for one-third of the purchase obligation. As a matter of practical convenience all negotiations and dealings with the owners of the securities and

with the lending bank were to be conducted in the name of the plaintiff alone, he being constituted their attorney-in-fact for those purposes. The securities were to be purchased in plaintiff's name, the bank loan likewise to be in his name, and notes to the bank and sellers of the securities to be in his name. No disclosure of the interest of the wife and son was to be made until such time as the bank or the sellers of the securities might exhaust the collateral put up to secure payment, and a deficiency resulted which plaintiff would be called upon to satisfy. Upon the happening of either contingency the joint liability of the wife and son was to be revealed. While acting as their agent under the contract plaintiff was to be held to a strict accountability, and he was to be reimbursed proportionately by each of them for all sums he should be called upon to pay out of his individual resources and for all expenses incurred by him in connection with the purchase of the securities and the operation of the enterprise. The purchase and financing were consummated in accordance with these agreements, slightly but not materially modified.

It was further agreed that all the income from the Southern Ice Company bonds or the other securities would go to liquidate the loans and would be credited on plaintiff's notes.

Between this contract on the one hand and the tri-party purchase and the loan contract, agreed upon in Dallas a few days before the execution of the family partnership contract but not executed until April 24, 1939, on the other, there were certain inconsistencies. The tri-party purchase contract, for example, provided:

"Purchaser hereby covenants with and warrants unto Bank that Purchaser is the legal and equitable owner of the securities.

\* \* \* \* \* \*

"Purchaser agrees that he will not, without the written consent of the Bank, so long as any of the indebtedness to the Bank shall remain unpaid, nor without the written consent of General Finance (the seller) so long as any of the indebtedness to General Finance shall remain unpaid, sell, transfer, assign, or otherwise dispose of the Securities or any part thereof."

The plaintiff gave as two of the reasons why the purchase and financing were carried through in his name instead of in the name of his wife, his son and himself (the son and wife being under no disability to contract for themselves), first, that it was simpler and more convenient to do it that way, and, secondly, that when prior to the purchase he informed the Dallas bank's attorney that the three were the purchasers, he was told because of the community property laws of Texas he, the bank's attorney, wanted to know nothing about a joint ownership, and he, the plaintiff, thought a word to the wise was sufficient. He mentioned it no more.

However, there was no concealment of the facts from the taxing authorities. Taxpayer's wife and son showed in their income tax returns large income for 1939, 1940 and 1941 from interest on bonds; books of account were promptly opened and contemporaneously kept showing the joint purchase, expenses incurred in connection therewith, income produced by the securities and how it was distributed; state intangible and other tax returns showed the divided ownership from the beginning,— and all of these records were made accessible to the government when the tax returns were audited.

The enterprise was successful from the date of the acquisition of the securities on April 24, 1939, and on October 30, 1941, the original note of $750,000 to the bank, chiefly by applying the interest paid on the pledged bonds, had been reduced to $500,-000, and plaintiff at that time informed the bank of the theretofore undisclosed family contract of April 21, 1939. Thereupon, after a further curtailment of $100,000 on the loan, advanced by plaintiff for the three and later repaid ratably to him, the plaintiff, his wife and son each gave new notes for one-third of the unpaid balance of $400,000, and one-third of the securities was issued to each. Meanwhile, the $250,-000 debt to the seller of the securities had been retired, before maturity, at a discount.

For the taxable years 1939 to 1941 inclusive the plaintiff, his wife and his son each returned for income tax purposes one-third of the income of the securities. Only 1941 tax liability is here in question because prior to the year 1941 all three of these taxpayers resided in Virginia, and any controversy as to tax liability for the earlier years will be heard in another forum.

## Opinion

The plaintiff contends that the family contract is bona fide, valid and binding; that the three parties became joint purchas-

ers of the securities; that each became jointly liable for the purchase price; that such control as plaintiff held over the securities and the income therefrom was only in his capacity as agent or attorney-in-fact for the partnership and that the apparent inconsistencies between the purchase contract and the partnership contract disappear when read in the light of the fact that all the warranties plaintiff made as to title were from his point of view made in behalf of the three and that the intent and purpose of the warranty was to.bind him to do nothing to lessen the value of the security; and that the family contract did not lessen that value but added to it by binding his wife and son, besides himself, to his obligation to the bank.

It is the position of the government that the language of the purchase contract is binding upon the plaintiff and is fatal to the family agreement; that under the provisions of the purchase contract the plaintiff alone acquired the securities which produced the income; that during the taxable year here in question the income from the securities was applied on his debt to the bank; that he alone is taxable thereon for the year 1941 up to October 30, when he gave two-thirds of the equity in the securities to his wife and son; that the family contract was a secret device designed to avoid taxes, had no legitimate objective and for tax purposes was void and useless; and that it is unrealistic to say that plaintiff's wife and son were bound on the obligation to the bank because in event of default on the loan they had only to fail to disclose or to terminate or destroy the secret agreement and the bank would be able to look only to the plaintiff for the deficiency.

 I can hardly bring myself to believe the taxpayer here, experienced as he was in the management and control of large business interests paying large income taxes, was unaware of the differences in the incidence of taxation if securities about to be acquired were owned by one person or by three. I doubt, however, that the tax motive controlled in bringing the wife and son into the purchase. My view is that the primary consideration was to place his son in a business not under the domination of the father, where he might demonstrate what business capacity he had and develop in a freer atmosphere. But if the greater reason had been to reduce taxes, that motive alone would not make taxable that which otherwise would not be. Apart from the tax motive, the question is was the thing done real and not pretensive and was it forbidden, either expressly or impliedly, by the law of the state or the federal statute.[1] Of course, if the purpose of the taxing act would be avoided or defeated by applying the state law the transaction must fail.

 As applied to taxes on income produced by personal services, he who earns is taxed, and he can not escape taxation if he enjoys the benefit of the income when received,[2] whether economic or financial.[3]

 Tax liability on income from capital, however, generally is based on ownership, for the tax is laid upon the ."net income of every individual", and the use of the word "of" denotes ownership. "In the absence of further definition by Congress, a broader significance should not be imputed to the phrase."[4]

In determining if claimed ownership is true or fictional certain criteria have been set up by the courts which should be applied where the circumstances so require. In Griffiths v. Commissioner of Internal Revenue, 308 U.S. 355, at page 357 et seq., 60 S.Ct. 277, at page 278, 84 L.Ed. 319, the Supreme Court said:

"We cannot too often reiterate that 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid.' Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916. And it makes no difference that such 'command' may be exercised through specific retention of legal title or the creation of a new equitable but con-

---

[1] Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355. See also (dissenting) Judge Hutcheson in Court Holding Co. v. Commissioner of Internal Revenue, 5 Cir., 143 F.2d 823, 826; Chisholm v. Commissioner of Internal Revenue, 2 Cir., 79 F.2d 14, 101 A.L.R. 200.

[2] Helvering v. Horst, 311 U.S. 112, 119, 61 S.Ct. 144, 85 L.Ed. 75. 131 A.L.R. 655.

[3] Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 181, 65 S.Ct. 591; Doll v. Commissioner of Internal Revenue, 8 Cir., 149 F.2d 239.

[4] Poe v. Seaborn, 282 U.S. 101, 51 S. Ct. 58, 75 L.Ed. 239; Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 6(4), 11, 57 S.Ct. 330, 81 L.Ed. 465; Helvering v. Fuller, 310 U.S. 69, 60 S.Ct. 784, 84 L.Ed. 1082.

trolled interest, or the maintenance of effective benefit through the interposition of a subservient agency. Cf. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355. 'A given result at the end of a straight path,' this court said in Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474, 'is not made a different result because reached by following a devious path.' Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed, particularly in the provisions of a tax law like those governing installment sales in § 44 of the Revenue Act of 1932 [26 U.S.C.A. Int.Rev.Acts, page 497]. Taxes cannot be escaped 'by anticipatory arrangements and contracts however skilfully devised * * * by which the fruits are attributed to a different tree from that on which they grew.' Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731."

■ Because a family group is an economic unit, socalled "family arrangements" whereby ownership is diluted, are to be given close and special scrutiny "lest what is in reality but one economic unit be multiplied into two or more by devices which, though valid under state law, are not conclusive so far as (Internal Revenue Laws) [are] concerned." Helvering v. Clifford, 309 U.S. 331, 335, 60 S.Ct. 554, 556, 84 L. Ed. 788. Nevertheless, the family relationship sets up no bar against its members reducing tax liability.[5] In testing the reality of the transaction, whether sham and pretensive or what on its face it purports to be, it is only "one of the elements to be considered by the trior of the facts."[6] Members of a family are as much entitled to jointly own stocks and bonds, or to become partners as the result of a joint venture,[7] as strangers in blood, provided, of course, the ownership is in good faith and not merely fanciful.

Except for the failure to make the joint purchase agreement known to the seller of the securities and to the bank which loaned three fourths of the purchase money, there would be nothing to impugn the good faith of the three parties who now claim they were the purchasers or to make questionable what they caused to be solemnly put down on paper as their agreement and which they signed and sealed as their act and deed. The inconsistencies between the tri-party contract and the family joint venture agreement would be of no consequence if the latter had been made known to seller and lender, and they had understood plaintiff's warranties were made in a representative capacity as well as personally. The explanation made seems to me reasonable. The plaintiff thought a bargain had been found. And so it turned out to be. His son and wife were exceedingly anxious for the sale to be consummated. They wanted the son established in a new business. The lending bank's attorney had created in the plaintiff's mind the bugaboo of community property. Plaintiff has testified he feared after all the preliminary points of difference had been reconciled, if he introduced new parties as joint purchasers with him the whole sale would be imperilled and perhaps defeated. He, his wife and son remain uncontradicted in their explanations of the reasons for a joint purchase. If they are to be believed their claims of good faith have been sustained.

The government says in opposition only that the circumstances refute good faith, no business or economic interest was to be served by a joint purchase (except reduction of tax liability) and it is unreasonable to believe the wife and son would expose their modest assets to so great a liability in so hazardous an undertaking.

■ I am unable to agree with the government.

The son was twenty-six years of age. He was handicapped in his father's ice company. He was married. He had his father's ambition and some of his capacity. He wanted "to be on his own." Jealousies, he thought, kept him from receiving the advancement he believed he had earned. His salary was small; his father supplemented it. In another ice company, similar to the one where he had received his business training, removed from his father's dominance, he told the family he could get his just reward. I find it not unreasonable to believe that the mother of an only son, indeed only child, under the circumstances would not be careful to count possible costs of the venture, but would be willing to stake it all on his capacity to make good in a new field. Dissatisfied as

---

[5] Commissioner of Internal Revenue v. Branch, 1 Cir., 114 F.2d 985, 987, 132 A. L.R. 839.

[6] Commissioner of Internal Revenue v. Katz, 7 Cir., 139 F.2d 107, 110.

[7] See Int.Rev.Code, Sec. 3797, 26 U.S. C.A. Int.Rev.Code, § 3797(a) (2).

he was, it is easy to believe the son felt the same way.

There was nothing illegal about the joint purchase agreement under the law of Georgia, where it was executed. The parties were able to contract, a consideration—a promise for a promise—was present, assent was given, and there was a subject matter upon which it could operate. That is all that is required. Ga.Code (1933), Secs. 20-107, 20-304, 53-505. The wife and son had a legal right to constitute the plaintiff their agent. They became undisclosed principals where he acted in their behalf within the authority granted. In their behalf, as I find, he executed promissory notes not under seal, and without revealing that he was acting for them as well as for himself. True on the notes he only could be sued, but on the original undertaking independently of the notes the undisclosed principals could be sued. Coaling Coal & Coke Co. v. Howard, 130 Ga. 807, 61 S.E. 987, 21 L.R.A.,N.S., 1051. The proceeds of the notes went to the benefit of the undisclosed principals in the acquisition of the securities, and they could have been sued in assumpsit, as for money had and received.

It seems clear to me that though the legal title of the securities purchased was in the father, he stood as a trustee for two-thirds thereof, the beneficial ownership of which was in his wife and son. Ga.Code (1933) Sec. 108-106; Swift v. Nevius, 138 Ga. 229, 75 S.E. 8.

But it is said the parties, at their pleasure, could have destroyed, cancelled or otherwise terminated the joint purchase agreement, and thereby defeated any possibility of personal liability on the part of the wife and son. In effect, this is to argue that these parties are shown by the evidence to be dishonest people, who would not keep their agreements, if disadvantageous, and thus will be presumed to act always as self-interest may direct. This has not been shown to my satisfaction. In fact, the only evidence before me touching such a possibility shows that the plaintiff has always met his obligations in full, though relieved of some of them by compromise, in past business transactions, with the exception of discounting substantially one of the notes given to the seller in this transaction through anticipating its maturity, a practice sometimes considered ethical in some business circles.

Certainly the plaintiff could not have claimed the securities for himself. Under the law he could not acquire rights in these securities antagonistic to his wife and son. Forlaw v. Augusta Naval Stores Co., 124 Ga. 261, 52 S.E. 898; Bacon v. Bacon, 161 Ga. 978, 983, 990, 133 S.E. 512. See also Hall v. Commissioner of Internal Revenue, 10 Cir., 150 F.2d 304–308, in which the court said: "We cannot say that the absolute power of the trustee to deal with the trust property as if it were his own empowers him to use it for his own personal advantage and gain. Such a construction of the trust instrument would be contrary to the fundamental principles of equity which guide trustees and protect trust property."

If I am correct in my statement that plaintiff held two-thirds of the securities in 1941 as trustee or agent for his wife and son, then there is no statutory basis for treating the entire income as his, under section 22(a), of the taxing Act, 26 U.S.C.A. Int.Rev.Code, § 22(a), defining Gross Income, merely because he had broad powers to manage the trust estate. Commissioner of Internal Revenue v. Branch, 1 Cir., 114 F.2d 985, 987, 988, 132 A.L.R. 839; Jones v. Norris, 10 Cir., 122 F.2d 6, 11. If his control was not in his own right, but as the representative of the true owners, whether as agent, guardian, trustee, attorney-in-fact, grantor or settlor, and he could not lawfully recapture the corpus or apply the income for his own benefit, he is not taxable on the income. Potter v. Commissioner of Internal Revenue, 47 B.T.A. 607. The Fifth Circuit Court of Appeals, speaking through Circuit Judge Hutcheson, has said: "Unearned incomes (are taxable) to those who own the property or right that produces them, not to those to whom their earners or owners are under contract to pay them. * * * If compensation paid to one is paid to him as the agent or servant in fact, not in fiction, * * * that income is taxable, not to the servant or agent as earner, but to its real earner, the principal." Saenger v. Commissioner of Internal Revenue, 69 F.2d 631, 632, 633.

The drawing of lines in tax cases, as in others, must depend in large measure upon the particular facts in each case. Taxability often becomes a matter of degree of command or control, or of economic benefit. Cases on similar facts can be cited both ways, but are of doubtful value in

reaching a conclusion. I am unable here to find any legal control for plaintiff's own benefit over two-thirds of the securities purchased, or as to that fractional part any other substantial incidents or attributes of ownership in him. Cf. Copland v. Commissioner of Internal Revenue, 7 Cir., 41 F.2d 501; Commissioner of Internal Revenue v. Olds, 6 Cir., 60 F.2d 252; Rose v. Commissioner of Internal Revenue, 6 Cir., 65 F.2d 616; Champlin v. Commissioner of Internal Revenue, 10 Cir., 71 F.2d 23; Kell v. Commissioner of Internal Revenue, 88 F.2d 453; Montgomery v. Thomas, 146 F.2d 76—the last two cases by the Fifth Circuit Court of Appeals.

The cases relied on by the government that follow the rulings in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, and Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665, are distinguishable on their facts. We are not here concerned with anticipatory or colorable arrangements to divide a taxpayer's future earnings produced by personal services, or ineffective agreements of partnerships or equitable partial assignments of a future fund. See Mead v. Commissioner of Internal Revenue, 131 F.2d 323; Villere v. Commissioner of Internal Revenue, 133 F.2d 905; Schroder v. Commissioner of Internal Revenue, 134 F.2d 346,—all Fifth Circuit Cases. Nor are we concerned with a family partnership of a going business, as distinguished from a joint ownership of securities, where one partner by his services produces the income and the other members of the family make no or negligible contribution of service or capital to the enterprise. In 1941, so far as the record before me shows, the plaintiff had no active part in the management of the Southern Ice Company, Inc.

The joint purchase agreement if real and not counterfeit, and the uncontradicted testimony of the plaintiff, his wife and his son, if believed, demand a finding that plaintiff purchased not for himself alone but for the joint account of the three, in equal shares; that the so-called family agreement, though not made public, was entered into in good faith, and was not a mere device or artifice to evade taxes; and that inconsistencies between the family contract and the contract with the seller and the lending bank are insufficient to overcome the testimony of the partners themselves as to their real purpose.

It is earnestly urged by the government that because the interest paid on the securities in 1941 was applied to the reduction of plaintiff's note at the Dallas bank, he alone was benefited and therefore the income was taxable to him alone. This argument overlooks or ignores the fact that in negotiating the bank loan, as well as in the purchase of the securities, plaintiff was in truth acting as the agent of his wife and son to the extent already discussed. If the income be considered as constructively paid to plaintiff, pro tanto it was paid to him as the "agent or servant in fact, not in fiction," of his co-adventurers or partners, and was used by him in the same way, to reduce their liability to the bank (undisclosed though it was at that time) as well as his own. Therefore, it becomes taxable to them in proportion to their interest in the fund.[8]

### Conclusions.

1. This court has jurisdiction of the parties and the subject matter. 28 U.S.C.A. § 41(5).

2. The income in question for the year 1941, the amount of which ($82,848.32) is not in question, representing interest on securities of Southern Ice Company, Inc., is taxable only to plaintiff's wife and son.

3. The Commissioner of Internal Revenue, therefore, erred in the assessment of the additional tax of $48,352.02 on such income, with interest thereon, against the plaintiff.

4. Plaintiff is entitled to recover of the Collector the assessment illegally exacted and collected with interest thereon as prayed.

Let judgment in accordance with these conclusions be presented on notice.

[8] Saenger v. Commr., supra.