**EPSEN LITHOGRAPHERS, Inc., v.**

**O'MALLEY, Collector of Internal Revenue.**

**Civil Action No. 550.**

District Court, D. Nebraska, Omaha Division.

June 14, 1946.

Edward Garvey, Richard E. Robinson, and Smith & Schall, all of Omaha, Neb., for plaintiff.

William B. Waldo, Sp. Asst. to Atty. Gen., and Joseph T. Votova, U. S. Dist. Atty., of Omaha, Neb., for defendant.

DONOHOE, District Judge.

This is an action by Epsen Lithographers, Inc., a corporation, formerly Epsen Lithographing Company, against George W. O'Malley Collector of Internal Revenue, for the District of Nebraska, to recover income taxes (declared value) excess profits taxes and excess profits taxes, with interest, paid under protest in the amount of $43,336.08, plus interest on that amount at the rate of 6% per annum from September 11, 1943, and to recover a further amount of $99.78, paid under protest, plus interest thereon at the rate of 6% per annum from December 11, 1943. The plaintiff also seeks recovery of costs expended in maintaining this action.

The case has been tried to the court, and the court makes the following special

### Findings of Fact.

1. The taxpayer is a Nebraska corporation having its office and principal place of business in the city of Omaha, Nebraska, and, with certain changes in its name, was continuously engaged in the lithographing business in the city of Omaha for twenty-five or more years immediately preceding March 31, 1941. (Tr. 3–7)

2. On March 31, 1941, and for some time prior to that date, Edward C. Epsen, father, and Edward J. Epsen, eldest son,

each owned 50% of the taxpayer's capital stock, and held offices as president and secretary-treasurer, respectively, of the taxpayer. This situation with respect to the taxpayer's officers and ownership of the taxpayer's stock existed at the time of the trial. (Tr. 4–7, 27–29)

3. Robert Epsen, a younger son of Edward C. Epsen, was thirty-four years of age at the time of the trial on August 30, 1945, was married, the father of three children, and had been associated with the taxpayer as an employee on a salary basis from 1931 until March 31, 1941. (Tr. 8, 46, 47, 51–54)

4. Thomas Epsen, also a son of Edward C. Epsen, was thirty-two years of age at the time of the trial, was married, the father of three children, and had been associated with the taxpayer as an employee on a salary basis from 1934 until March 31, 1941. (Tr. 8, 9, 51–54)

5. Robert Epsen and Thomas Epsen have never owned any of the taxpayer's capital stock, or held any office connected with the taxpayer. (Tr. 8, 9, 51)

6. Edward C. Epsen, Edward J. Epsen, Helen J. Epsen, Robert Epsen and Thomas Epsen were, by reason of their special skill, training, experience and scientific knowledge, particularly fitted for the lithographing business. (Tr. 3–7, 16–18, 45–50, 55, 56)

7. Prior to March 31, 1941, Robert Epsen and Thomas Epsen had unsuccessfully attempted to buy stock or otherwise acquire an interest in the taxpayer's business, which would give them a future greater than that of merely an employee on a salary basis. Having been unsuccessful in these efforts, Robert Epsen and Thomas Epsen were, on March 31, 1941, considering offers of employment at increased salaries, and with options to purchase capital stock in the business of competitors in the field of lithographing. (Tr. 15, 16, 51, 52)

8. On March 31, 1941, Edward C. Epsen, Edward J. Epsen, his wife Helen J. Epsen, Robert Epsen and Thomas Epsen executed a Partnership Agreement (Tr. 2, 14, 51—plaintiff's exhibit 1) for the formation of a general partnership between these parties to carry on the lithographing business, previously carried on by the taxpayer. This partnership has continued in existence up to the time of the trial of this case. (Tr. 2)

9. The sole purpose for the formation of the partnership on March 31, 1941, was to retain Robert Epsen and Thomas Epsen in the business which had been built up and created by the personal and lifelong efforts of Edward C. Epsen and his eldest son, Edward J. Epsen. (Tr. 15, 16, 51, 52)

10. Under the terms of the Partnership Agreement, profits and losses of the partnership were shared in the following proportions: Edward C. Epsen, 40%; Edward J. Epsen, 20%; Helen Epsen, 20%; Robert Epsen, 10%; Thomas Epsen, 10%. (Plaintiff's exhibit 1)

11. During the fiscal year April 1, 1941, to March 31, 1942, profits from the partnership were divided: Edward C. Epsen, 40%; Edward J. Epsen, 20%; Helen Epsen, 20%; Robert Epsen, 10%; Thomas Epsen, 10%. (Tr. 17)

12. The contributions invested by the partners in the capital of the partnership were: Edward C. Epsen, $15,000; Edward J. Epsen, $7,500; Helen J. Epsen, $7,500; Robert Epsen, $4,000; Thomas Epsen, $4,000 (Tr. 16, 17); and the total sum of the contributions ($38,000) was paid in by the partners from their individual property on May 29, 1941. (Tr. 3744.45)

13. On April 1, 1941, the partnership borrowed $50,000 from a bank (Tr. 17, 37, 38, 44) on the individual and personal credit of the partners, evidenced by a note representing an obligation of all of the partners. (Tr. 38)

14. Prior to the formation of the partnership on March 31, 1941, the status of Robert Epsen as an employee of the taxpayer was confined chiefly to work in the taxpayer's finishing department, and some connection with the purchasing of equipment and supplies. (Tr. 33, 47, 48) After the partnership was formed, and during the taxpayer's fiscal year now in question, Robert Epsen was promoted to production manager, and, in that capacity, was given executive responsibilities and complete charge of the operation of the lithographing plant

184

with a free hand to adopt and put into effect ideas and chemical formulas which he had personally developed and conceived in connection with the process of lithographing. (Tr. 17, 33, 47-49, 55, 56)

15. After the formation of the partnership on March 31, 1941, Thomas Epsen was promoted to the position of sales manager with executive duties in consummating and promoting sales of the products of the partnership. (Tr. 18, 33)

16. On March 31, 1941, the taxpayer, acting through Edward C. Epsen, the taxpayer's president, discontinued active business in lithographing and leased to the partnership all of the taxpayer's physical property, equipment and machinery located at the taxpayer's plant at 2001 Webster Street, in the city of Omaha, Nebraska, for a term of one year beginning on April 1, 1941, and ending on March 31, 1942. (Tr. 19, 20, plaintiff's exhibit 2)

17. The property covered by the lease, dated March 31, 1941, consisted principally of five presses, one pony press, three cutting machines, a photo imposing machine, and some small tools and office equipment, and such property had a depreciated value of $102,000.00 on March 31, 1941. (Tr. 19, 20, 22, 23, 30)

18. Pursuant to the terms of the lease (plaintiff's exhibit 2), the partnership, as lessee, was obligated to pay, and did pay, to the taxpayer, as lessor, the sum of $15,600.-00, as net cash rent during the year commencing on April 1, 1941, and ending on March 31, 1942, for the property covered by the lease. (Tr. 20, 21, 53)

19. Under the provisions of the lease, the partnership, as lessee, was obligated to repair and maintain the leased property at its own expense, and to carry insurance on such property. (Tr. 20, plaintiff's exhibit 2)

20. During the taxpayer's fiscal year commencing April 1, 1941, and ending March 31, 1942, the partnership paid out the sum of approximately $7,000 as the costs of necessary repairs, upkeep, and insurance on the property covered by the lease (Tr. 20, 21, 53) in addition to the $15,600.00 as cash rent. (Tr. 21)

21. On March 31, 1941, the partnership took over and assumed the taxpayer's obligations under a previously existing lease between the taxpayer, as lessee, and the Epsen Investment Corporation, as lessor and owner of the building in which the taxpayer's business was located. (Tr. 20, 29, 30)

22. On March 31, 1941, the partnership adopted and took over the taxpayer's former corporate name of "Epsen Lithographing Company" and such good will as might be connected with that name (Tr. 23, 24) and the taxpayer adopted the name of "Epsen Lithographers, Inc." (Tr. 26)

23. The value of the good will connected with the use of the name "Epsen Lithographing Company" was primarily attached to and dependent upon the individuals carrying on business under that name. (Tr. 24, 62, 63)

24. The lithographing business carried on by the taxpayer prior to March 31, 1941, was a highly personalized and individualized service, depending entirely for its success upon the personal and individual ability, experience, efforts and contacts of members of the Epsen family, and the taxpayer's business and good will had but little value that could be retained without the services of members of the Epsen family. (Tr. 7-10, 12-14, 32, 62-66)

25. Before the formation of the partnership on March 31, 1941, Helen J. Epsen was identified with the taxpayer's business from an idea and styling standpoint (Tr. 16) but received no salary aside from sharing jointly in the earnings and holdings of her husband, Edward J. Epsen. (Tr. 34)

26. During the fiscal year April 1, 1941, to March 31, 1942, Helen J. Epsen, through close personal friendship and relations, was primarily responsible for some of the largest accounts of the partnership, representing a total volume of business amounting to $150,000 a year. (Tr. 34, 35)

27. All of the members of the partnership, except Helen J. Epsen, devoted and contributed substantially all of their time and services to the business carried on by the partnership during the taxpayer's fiscal year, April 1, 1941, to March 31, 1942. (Tr. 17, 18, 49, 55, 56)

28. The income of the taxpayer before March 31, 1941, and the income of the partnership subsequent to that date, was primarily dependent upon and derived chiefly through the personal efforts, skill, ability and contacts of Edward C. Epsen, Edward J. Epsen, Helen J. Epsen, Robert Epsen, and Thomas Epsen. (Tr. 7–10, 12–18, 32, 65, 66)

29. The taxpayer's annual advertising expense during the fiscal years from 1936 to 1941 was approximately $670 per year, and the annual sales salaries, excluding salaries of the taxpayer's officers, were approximately $6,600 per year. (Tr. 11, 12)

30. The taxpayer's annual gross sales for the fiscal years from April 1, 1935, to March 31, 1941, were: 1936, $301,000; 1937, $356,000; 1938, $348,000; 1939, $389,-000; 1940, $517,000; 1941, $666,000. (defendant's exhibit A, Tr. 39, 40)

31. The gross sales of the partnership for the fiscal year April 1, 1941, to March 31, 1942, were $806,000. (Tr. 40)

32. The sum of $15,600 paid by the partnership to the taxpayer as net cash rent under the Lease Agreement (plaintiff's exhibit 2) during the taxpayer's fiscal year April 1, 1941, to March 31, 1942, was a fair, reasonable and adequate amount as rent to the taxpayer for the property covered by the lease and the use by the partnership of the name "Epsen Lithographing Company," and any good will attached to that name. (Tr. 25, 53, 55, 61, 62)

33. The Commissioner of Internal Revenue, through A. R. Baker, an internal revenue agent, computed and assessed the taxes of the taxpayer for the fiscal year April 1, 1941, to March 31, 1942, on the basis of computations shown by defendant's exhibit A, which was duly offered and received in evidence. (Tr. 68–72)

34. On the basis of the computations shown in defendant's exhibit A, and applying Section 45 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 45, and Regulations thereunder, the Commissioner reallocated to the taxpayer from the income of the partnership the sum of $85,044.10, as additional (rental) income to the taxpayer for the fiscal year April 1, 1941, to March 31, 1942. (Tr. 68–78, defendant's exhibit A)

35. The entire income of the partnership and of the taxpayer for the fiscal year April 1, 1941, to March 31, 1942, was fully reported, and no attempt or effort was made by the taxpayer or by members of the partnership to avoid or evade taxes. (Tr. 73, 74)

36. The court further finds all of the facts which have been stipulated.

### Discussion

It has been stipulated during the trial of this case that the taxpayer's reported net income for the fiscal year ending on March 31, 1942, was $4,456.40, the sum of approximately $11,000 having been taken by the taxpayer as a deduction for depreciation on assets leased to the partnership, and that the reported net income of the partnership was $187,555. (Tr. 40) It was further stipulated that the amended net income of the taxpayer, as presented by the Revenue Agent's report, was $90,-345.75; that the amended net income of the partnership was $102,580.90; and that in addition to the adjustment of $85,044.-10, now in controversy, there were two other adjustments; one of $845.25 added to the income of the taxpayer, and one of $70 added to the income of the partnership. (Tr. 40, 41)

The parties have also stipulated that the partnership reported a net income of $187,-555; divided in reporting by the partners as follows: Edward C. Epsen, $75,022; Edward J. Epsen, $37,511; Helen J. Epsen, $37,511; Robert Epsen, $18,755.50; and Thomas Epsen, $18,755.50. (Tr. 42)

Likewise, it has been stipulated that the members of the partnership paid taxes in the following amounts on income from the partnership during the fiscal year April 1, 1941, to March 31, 1942; Edward C. Epsen, $41,630.99; Edward J. Epsen, $17,-076.62; Helen J. Epsen, $14,125.93; Robert Epsen, $3,410.59; Thomas Epsen, $3,-269. (Tr. 42)

The taxpayer's complaint alleges, and the answer admits, that as the result of the internal revenue agent's reallocation of $85,044.10, as income to the taxpayer, deficiencies totaling $40,426.58 in income

taxes (declared value), excess profits taxes, and excess profits taxes, plus an additional amount as interest, were determined and assessed against the taxpayer for its fiscal year ending on March 31, 1942. It is also alleged and admitted that on September 11, 1943, the taxpayer, under protest, paid the sum of $43,336.08 to the defendant, and that on December 11, 1943, the taxpayer, under protest, paid an additional sum of $99.78, which was demanded by the defendant as interest.

The taxpayer alleges that it has duly filed claims for refund of the amounts paid, and the answer admits that such claims were filed and were disallowed.

The statute with which we are now concerned, Section 45 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 45, provides:

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

The question for decision is whether, under the facts of this case, the Commissioner is authorized to apply Section 45 of the Internal Revenue Code to re-allocate to a corporate taxpayer a portion of the income received by a partnership, during the taxpayer's fiscal year, where the taxpayer, at the beginning of that year, has discontinued active business and leased its equipment and the use of its name to a general partnership, formed by the taxpayer's sole stockholders and other members of the stockholders' families.

It is undisputed that, prior to the commencement of the fiscal year in question, and throughout that year, all of the taxpayer's capital stock was owned in equal shares by Edward C. Epsen, the father,

and Edward J. Epsen, his eldest son. There is uncontradicted testimony that the two younger sons, Robert Epsen and Thomas Epsen, both of whom had spent several years as employees of the taxpayer, and who were married, and had children, were demanding that they be given some interest in the business carried on by the other members of the family, which would give these boys a future offering something more than the status of employees on a salary basis. (That Robert Epsen and Thomas Epsen were justified in making such demands and requests clearly appears from the evidence that, before the formation of the partnership, they had been working for a salary in the neighborhood of from $4,000 to $5,000 per year, and that the share of each of them in the profits of the partnership during the fiscal year in question was in excess of $18,000.) Furthermore, the evidence establishes that Robert Epsen and Thomas Epsen, after their father had declined to sell stock in the corporate taxpayer to them, had been offered opportunities of employment at more salary with competing organizations and with an opportunity to buy stock in such organizations.

In view of these facts, and confronted with the problem of keeping Robert Epsen and Thomas Epsen in the business established by the family, Edward C. Epsen, the father, and Edward J. Epsen, the eldest son, consented to the formation of a general partnership to carry on the lithographing business formerly carried on by the taxpayer.

At the outset, and as preliminary to taking up specifically the application of Section 45 of the Internal Revenue Code to the facts of the action sub judice, a few fundamental and well recognized principles in the field of tax law may be reiterated for guidance in the instant case.

Legislative words, particularly in the provisions of a tax law, are not inert and derive vitality from the obvious purpose at which they are aimed. Griffiths v. Helvering, 308 U.S. 355 at page 358, 60 S.Ct. 277, 84 L.Ed. 319; quoted with approval in Nebraska National Hotel Co. v.

O'Malley, D.C.Neb., 63 F.Supp. 26 at page 31.

Taxes can not be escaped by anticipatory arrangements and contracts however skillfully devised—by which the fruits are attributed to a different tree from that on which they grew. Lucas v. Earl, 281 U.S. 111 at page 115, 50 S.Ct. 241, 74 L.Ed. 731; Nebraska National Hotel Co. v. O'Malley, supra.

The Supreme Court has said:

"In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen." Gould v. Gould, 245 U.S. 151 at page 153, 38 S.Ct. 53, 62 L.Ed. 211; United States v. Field, Executor, 255 U.S. 257, 41 S.Ct. 256, 65 L.Ed. 617, 18 A.L.R. 1461; see also White v. Aronson, 302 U.S. 16 at page 20, 58 S.Ct. 95, 82 L.Ed. 20.

Justice Sutherland has stated that:

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465 at page 469, 55 S.Ct. 266, 267, 9 L.Ed. 596, 97 A.L.R. 1355.

In Commissioner v. Tower, 66 S.Ct. 532, 536, the court again quoted the above rule and added that:

"We do not reject that principle."

Transactions entered into by taxpayers which are legal and bona fide business arrangements can not be upset even if the parties have entered into them for the purpose of minimizing or avoiding taxes which might otherwise accrue; each case being essentially one for decision upon its own particular facts. Hardymon v. Glenn, D.C., 56 F.Supp. 269 at page 273, and cases there cited. Montgomery v. Thomas, 5 Cir., 146 F.2d 76.

The dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it, and enjoy the benefits of it when paid. Helvering v. Horst, 311 U.S. 112 at page 119, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655.

I quote the following from an opinion by Justice Reed:

"A taxpayer is free to adopt such organization for his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages.

"On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property." Higgins v. Smith, 308 U.S. 473 at pages 477 and 478, 60 S.Ct. 355, 358, 84 L.Ed. 406.

It is settled that arrangements by which income is spread among members of a family are subject to careful scrutiny. Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788; Commissioner v. Tower, 66 S.Ct. 532; Beazley v. Allen, D.C.Ga., 61 F.Supp. 929, 934.

"Nevertheless, the family relationship sets up no bar against its members reducing tax liability. In testing the reality of the transaction, whether sham and pretensive or what on its face it purports to be, it is only 'one of the elements to be considered by the trior of the facts.' Members of a family are as much entitled to jointly own stocks and bonds, or to become partners as the result of a joint venture, as strangers in blood, provided, of course, the ownership is in good faith and not merely fanciful." Beazley v. Allen, supra.

In considering the application of Section 45 of the Internal Revenue Code

to specific cases, the following rules have been established with respect to this statute:

Under Section 45, Congress has conferred broad discretion on the Commissioner to allocate gross income or deductions between or among organizations controlled by the same interests, National Securities Corporation v. Commissioner, 3 Cir., 137 F.2d 600, certiorari denied 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479, but the exercise of that discretion, by express provisions of the statute, is limited to cases wherein the Commissioner determines that such allocation is necessary in order (1) to prevent evasion of taxes, or (2) to clearly reflect the income of any of such organizations. National Securities Corporation v. Commissioner, supra; Merten's Law of Federal Income Taxation, Volume 8, Section 46.69

■ The principal purpose of Section 45 is to clearly reflect income that exists and to provide a means of correcting what may have been improperly done in bookkeeping between organizations controlled by the same interests. Ross v. Commissioner, 5 Cir., 129 F.2d 310; Tennessee-Arkansas Gravel Co. v. Commissioner, 6 Cir., 112 F.2d 508.

■ Section 45 does not authorize the Commissioner to set up income where none exists. Tennessee-Arkansas Gravel Co. v. Commissioner, supra.

With reference to Section 45 and Treasury Regulation No. 103, promulgated under the Internal Revenue Code (see footnote [1] to this memorandum), it is said in Merten's Law of Federal Income Taxation, Volume 8, Section 46.69, that:

---

[1] Treasury Regulations 103, promulgated under the Internal Revenue Code:

Sec. 19.45—1. *Determination of the taxable net income of a controlled taxpayer.*—

(a) *Definitions.*—When used in this section—

(1) The term *"organization"* includes any organization of any kind, whether it be a sole proprietorship, a partnership, a trust, an estate, or a corporation (as each is defined or understood in the Internal Revenue Code or these regulations), irrespective of the place where organized, where operated, or where its trade or business is conducted, and regardless of whether domestic or foreign, whether exempt, whether affiliated, or whether a party to a consolidated return.

(2) The term *"trade"* or *"business"* include any trade or business activity of any kind, regardless of whether or where organized, whether owned individually or otherwise, and regardless of the place where carried on.

(3) The term *"controlled"* includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

(4) The term *"controlled taxpayer"* means any one of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests.

(5) The terms *"group"* and *"Group of controlled taxpayers"* means the organizations, trades, or businesses owned or controlled by the same interests.

(6) The term *"true net income"* means, in the case of a controlled taxpayer, the net income (or, as the case may be, any item or element affecting net income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. It does not mean the income, the deductions, or the item or element of either, resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement, the controlled taxpayer, or the interests controlling it, chose to make (even though such contract, transaction, or arrangement be legally binding upon the parties thereto).

(b) *Scope and purpose.*—The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable net incomes are thereby understated, the statute contemplates that the Commissioner shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income or deductions, or of any item or element affecting net income,

"The purpose of these provisions is to prevent the arbitrary shifting of gross income and deductions among businesses owned or controlled by the same interests; to prevent the avoidance of taxes or the distortion of income by the shifting of profits from one business to another; to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining according to the standards of an uncontrolled taxpayer, the true net income of the property and business of a controlled taxpayer."

The taxpayer concedes in the present case that when the Commissioner, in the exercise of his discretion under Section 45, determines that an allocation of income among controlled organizations is necessary, and a taxpayer seeks judicial review of such determination, the taxpayer then has the burden of showing that the determination is arbitrary and an abuse of the Commissioner's authority. See Merten's Law of Federal Income Taxation, Volume 8, Section 46.69.

▮▮▮▮ With respect to the Commissioner's finding of value of property, and assessment of deficiencies, the rule in the Eighth Circuit is that:

"It is accepted law that the commissioner's finding of value is entitled to a presumption of correctness. An assessment which he makes is prima facie correct, and the burden is on the taxpayer to overcome the presumption of its correctness. Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 55 S.Ct. 158, 79 L.Ed. 367; Public Opinion Pub. Co. v. Jensen, 8 Cir., 76 F.2d 494. The presumption, however, is a rebuttable one, and will only support a finding in the absence of any substantial evidence to the contrary. St. Louis Union Trust Co. v. Becker, 8 Cir., 76 F.2d 851, affirmed 296 U.S. 48, 56 S.Ct. 78, 80 L.Ed. 35. Where the act of the commissioner is reviewed judicially, his findings of fact in making an assessment, as distinguished from his determination involving administrative discretion, constitute only 'prima facie evidence.' Williamsport Wire Rope Co. v. United States, 277 U.S. 551, 48 S.Ct. 587, 72 L.Ed. 985; Wickwire v. Reinecke, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184.

"The presumption of correctness is in the class of the 'burden of proof presumption'. Morrison v. People of California, 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664; Casey v. United States, 276 U.S. 413, 48 S.Ct. 373, 72 L.Ed. 632. The party against whom it is invoked must fail if he does not produce evidence against it. It is often referred to in the books as the true presumption. 'A true presumption is not evidence, though it supplies its place and requires the other party to proceed with the negative. Unless he does he loses; when he does, the presumption is out of the case, and the issue is open.'" (Citing cases) Wiget v. Becker, 8 Cir., 84 F.2d 706, at pp. 707 and 708.

Applying the foregoing principles, what is the result in the instant action? At the risk of repetition, what are the actualities? A father and his eldest son have, through their lifelong and personal efforts, built up

---

between or among the controlled taxpayers constituting the group, shall determine the true net income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

Section 45 and this section apply to the case of any controlled taxpayer, whether such taxpayer makes a separate or a consolidated return. If a controlled taxpayer makes a separate return, the determination is of its true separate net income.

\* \* \*

(c) *Application.*—Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true net income of a controlled taxpayer, the Commissioner is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income or deductions. The authority to determine true net income extends to any case in which either by inadvertence or design the taxable net income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

and created an admittedly profitable business in lithographing. They have carried on this business through a corporation in which they were the sole stockholders. In the meantime, two younger sons have grown up, acquired an education and experience in the lithographing business, and have spent several years as employees of the corporation. Then comes a time when the younger sons become dissatisfied with their lot as mere employees, and demand that they be given a greater share in the business. They are offered more salary elsewhere, and by competitors in the field of lithographing.

Under the circumstances the father and his eldest son consent to giving the younger sons more interest in the family business by forming a partnership to carry on the business carried on previously through the corporation. In consummation of this arrangement, a lease is executed whereby the corporation leases its physical property to the partnership, and thereafter all of the stockholders, whose efforts had previously been the source of income to the corporation, cease working for the corporation and devote their entire time to the business of the partnership.

A fair, reasonable and adequate amount to be paid as rent by the partnership is agreed upon, and is in fact paid to the corporation for the use of the leased property.

 A mere statement of the facts compels the conclusion that Section 45 does not authorize the Commissioner to allocate or "throw back" to the corporation, from the income of the partnership, an additional amount as income to the corporation on any basis.

In fact, none of the prerequisites for the application of Section 45 exist in this case. Aside from the fact that negotiations for the formation of the partnership were carried on by family discussions—and one might reasonably inquire here as to in what other way these negotiations could have been carried on—there is not a scintilla of evidence to justify an inference that the transactions were entered into for the purpose of evading or avoiding taxes. Actually, all of the evidence is to the contrary.

As to the remaining ground upon which the Commissioner is authorized by Section 45 to allocate income among controlled organizations—to correctly reflect the income of such organizations—it is self-evident that any attempt to justify the Commissioner's action on this ground would, under the facts of this case, be in direct violation of the rule that Section 45 does not authorize the Commissioner to set up or create income where none exists. See Tennessee —Arkansas Gravel Co. v. Commissioner, supra.

It has been pointed out elsewhere in this memorandum that the corporate taxpayer was primarily dependent upon the personal services and efforts of members of the Epsen family for its business and income. When these parties terminated their services for the corporation, and associated themselves in a partnership, the income from their activities came into the hands of the partnership, and this income may not now be cast back to the corporation.

In its argument, the defendant places much stress upon the sentence in the Partnership Agreement reciting that:

"The capital of this co-partnership shall consist at the outset of the going business in lithographing which is being conveyed to said partnership by the Epsen Lithographing Co. * * *"

It is argued that there is no showing that the taxpayer ever received anything for a dynamic "going business in lithographing," and that the partnership appropriated this business to itself without paying the corporation adequate consideration therefor. Consequently, the defendant seeks to justify the Commissioner's action in reallocating a part of the income of the partnership to the corporate taxpayer on this ground.

This argument is not persuasive. In the first place, whether the sum of $15,600 per year, which was paid to the taxpayer for property turned over by it to the partnership, was an adequate consideration was a matter for the owners to decide, and there is uncontradicted testimony that such amount was adequate. In the second place, the great preponderance of the evidence, including the testimony of a disinterested and well-qualified witness, Harvey E. Milliken,

whom the defendant did not even see fit to cross-examine, is to the effect that the taxpayer's going business in lithographing had no great value apart from the persons carrying on that business.

The remaining argument advanced by the defendant in support of the Commissioner's action is predicated upon the proposition that, because of the family relationship existing between members of the partnership and the taxpayer's sole stockholders, the statutory requirement of two organizations owned or controlled, directly or indirectly, by the same interests is satisfied. With no other foundation in the evidence for its argument than the testimony of Edward J. Epsen that negotiations for the formation of the partnership were carried on through family discussions, the defendant contends that the transactions between the taxpayer and the partnership were not "at arm's length," and that therefore the Commissioner's reallocation of income to the taxpayer was authorized under the provisions of Treasury Regulation No. 103, giving the Commissioner authority to determine true net income in any case where, either by inadvertence or design, the taxable net income of a controlled taxpayer, in whole or in part, is other than it would have been had the taxpayer in the conduct of its affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

These arguments do not affect the outcome of the present case. Under Section 45, the Commissioner is authorized to allocate income only as between organizations controlled by the same interests. The taxpayer and the partnership are not, in the present case, controlled by the same interests. The taxpayer is controlled by two members of the family; the partnership is controlled by five members of the family.

There is uncontradicted testimony that the interest of Helen J. Epsen in the partnership was paid for out of her own separate funds. In view of this undisputed evidence, and the lack of any showing to the contrary, it will not be presumed that Edward J. Epsen controlled his wife's interest in the partnership.

Even if it were conceded that the taxpayer and the partnership were controlled by the same interests, the Commissioner's action can not be justified under Section 45 because, under the facts of this case, there has been neither an evasion or avoidance of taxes, nor a situation wherein a reallocation is necessary "clearly to reflect the income of any of such organizations * * *" within the meaning of the statute.

### Conclusions of Law.

1. Section 45 of the Internal Revenue Code does not apply to the facts of this case, and the Commissioner's action thereunder in reallocating as income to the plaintiff $85,044.10 out of the income of the partnership for the fiscal year April 1, 1941, to March 31, 1942, was unauthorized and arbitrary. See John Wachtel Corporation v. Commissioner, Tax Court's decision of June 29, 1945, docket No. 4764.

2. The plaintiff is entitled to judgment against the defendant in the amount of $43,435.86, with interest and costs as provided by law. See 26 U.S.C.A. Int.Rev. Code, § 3770 (b) (1, 2); Section 3771 (a), (b) (2); 28 U.S.C.A. § 284; Allis v. La-Budde, et al., 7 Cir., 131 F.2d 78; Samson Tire & Rubber Corp. v. Rogan, 9 Cir., 140 F.2d 457; Carter v. Liquid Carbonic Pacific Corporation Ltd., 9 Cir., 97 F.2d 1.

Judgment will be entered in keeping with this memorandum.

Attorneys for plaintiff prepare and submit form for approval.