W. R. Ross, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Mary Catherine Ross, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Ross Brothers Horse & Mule Co., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 94474, 94475, 94476, 98898.   Promulgated March 27, 1941.

*Charles B. McInnis, Esq.,* for the petitioners.
*James L. Backstrom, Esq.,* and *James H. Yeatman, Esq.,* for the respondent.

1156

1158

1162

1166

TURNER: The principal issue presented is whether the trading business conducted through the W. R. Ross mule account was a branch or a part of the business conducted by the corporation, Ross Brothers Horse & Mule Co., with the result that the profits realized therefrom constituted a part of and should be included in the income of the corporation.

The petitioners claim that during the years in question the W. R. Ross mule account was a partnership composed of four individuals, Ross, Pershall, Jameson, and Hicks; that the trading business conducted by the partnership was separate and distinct from the commission business of the Ross Brothers Horse & Mule Co.; and that the profits resulting therefrom were distributable directly to the four partners. The respondent claims that the mule account was part and parcel of the Ross Brothers Horse & Mule Co., the corporation; that it was not a separate entity; and that the profits realized from that account constituted income of the corporation. By affirmative allegations contained in an amended answer, the respondent pleads in the alternative that if the Board should determine that the profits reflected by the W. R. Ross mule account were the profits of a partnership and not of the corporation, the deductions claimed by the corporation on its return should be apportioned between it and the partnership in accordance with the provisions of section 45 of the Revenue Act of 1934. The petitioners plead in

the alternative that if the Board should determine that the auction and trading activities were the activities of a single business enterprise and the profits therefrom are to be combined for Federal tax purposes, it should further hold that the activities in question and the income therefrom were the activities and income of the "W. R. Ross Mule Account," a partnership, and not the income of the Ross Brothers Horse & Mule Co., the corporation.

The respondent, to support his contention that the trading operations reflected by the W. R. Ross mule account were the operations of the Ross Brothers Horse & Mule Co., points, among other things, to the fact that the mule account had no separate physical facilities for conducting its business; that it had no separate finances or bank account; that all payments for the purchase of livestock through that account and for the feed and supplies for such livestock were made by the corporation; that all receipts from the sales made through the account were received by the corporation; and that all borrowings to carry on the business of buying and selling were made by the corporation. He emphasizes particularly the fact that the corporation charged the mule account no commission on the sale of any animal carried into that account, whereas other vendors were charged $2.50 for each animal sold for $10 or more.

Petitioners contend that in the horse and mule commission business it is customary for the commission house to furnish to its customers certain facilities and services, for some of which charges are made, while as to others there is no charge; and, except for the fact that no commissions were charged on sales by and for the mule account, that account was treated in the same way as any and all other trading customers of the corporation; and, further, that there is nothing in the treatment of the mule account to indicate that the trading reflected therein was any more the trading of the corporation than the dealings of any of the other trading customers.

On first impression the answering argument of the petitioners may seem plausible and convincing, but on examination it appears so only if we presuppose the conclusion contended for. There is nothing conclusive or particularly indicative, for instance, about the fact that the trading activities have been recorded in the books of the corporation in a separate account any more than that the commissions received from the auction were separately recorded. It would seem to us good practice that the accounts should be so kept whether the trading so recorded be that of an outside trader or of the corporation itself. Furthermore, since the corporation through its auction stood to profit from the activities of its regular trading customers, there is nothing strange about the granting of the use of its facilities to such customers or the keeping of accounts on its books

reflecting its dealing for or with such customers, and the keeping of such accounts for customers neither refutes nor establishes the point in issue. In fact, we find only two practices which might tend to support the conclusion that the W. R. Ross mule account was a business enterprise separate and apart from the corporation. One was the paying or crediting of the profits reflected by the mule account at the end of each year directly to Ross, Pershall, Jameson, and Hicks instead of the carrying of such profits into corporate surplus and undivided profits and then making the distribution from surplus. The other practice was that of reporting such profits for income tax purposes as the profits of the four individuals and not as the profits of the corporation. The first practice is of little significance, since the corporation at no time during its existence maintained a surplus or undivided profits account, but consistently at the end of each year paid over to the individuals named, or transferred to their personal accounts, its entire profits for the year from commissions or otherwise. As to the second practice, it is, of course, elementary that the reporting of the profits of the mule account by the individuals in their income is of no moment if in truth the trading activities and the profits therefrom were those of the corporation.

With respect to the failure of the auction to charge commissions on horses and mules handled through the mule account, which fact the respondent emphasizes as showing the unity of the auction and the trading activities, it would seem apparent that such treatment of the mule account, if a separate entity as the petitioners contend, would most likely result in very substantial savings to it at the expense of the auction. In answer the petitioners claim that very rarely were horses and mules belonging to the mule account sold through the auction and consequently any withholding thereby of profits from the auction were insignificant. It is to be noted, however, that the corporation charged commissions on private sales made for customers as well as on sales made through the auction. The record indicates that most of the mules disposed of through the mule account were either used in filling orders received from customers away from Fort Worth or were shipped to agents for sale elsewhere and the petitioners have given us no basis for making any determination as to the percentage of such sales, which in the case of admittedly independent traders would be classified as private sales on which commissions would be charged or the percentage on which commissions would not be charged. The total sales reflected by the mule account were $843,324.17 for 1934, $1,353,035.92 for 1935, and $852,908.13 for 1936. Accordingly if the auction and the trading businesses be considered separately, it is readily apparent that through this failure to charge the mule account with commissions

on its sales at auction and privately a substantial portion of what otherwise would have been profits for the auction business may have been retained by the mule account, a result which would not normally occur if the auction and trading activities were conducted by two separate entities as the petitioners claim. There are other factors, however, in respect of which the facts are fully established which in our opinion leave no doubt that the auction and the trading activities constituted a single business enterprise.

When the corporation was first organized Ross and his brothers agreed that each might trade on his own account and that the profits or losses should accrue to or against the respective individuals. They made this arrangement, according to Ross, because he was interested in trading in horses and mules, while his brothers were interested in trading in cattle and sheep. After Ross purchased the stock held by his brothers, however, the reason and need for keeping the operations reflected in the mule account separate and apart from the operations of the corporation no longer existed and the evidence of record convinces us that the business was thereafter regarded and conducted as a single enterprise. At all times subsequent to the withdrawal of his brothers and up to 1927, Ross had full direction and control of both the auction and trading activities and except for a small allowance to Hicks in 1924 and subsequent years, he received at the end of each year full distribution of all profits from all activities. In 1927, however, due to the fact that the business had grown substantially and Ross had extensive outside interests which required his attention, he decided to bring D. H. Pershall and Frank Harp, two experienced mule men, into the business, and upon the death of Harp in 1929, Jameson succeeded to Harp's position and rights. The bringing in of Pershall and Harp, and later Jameson, brought no change in the unity of the operations. According to the testimony of Ross, the duties and responsibilities of Pershall and Harp, and later of Pershall and Jameson, were practically the same as his except that he was "supposed to be the boss, and the guider." Hicks did not participate in the conduct of the auction or trading activities and his duties were not affected in any way by the bringing in of Pershall, Harp, and Jameson. Further, according to the testimony of both Ross and Hicks, there was no segregation or attempt at segregation of the time and efforts of Ross, Pershall, and Jameson in their conduct of the auction and trading activities, and in the course of conducting the auction they were very often and at the same time performing those acts and duties the results of which were reflected in the mule account.

That the two activities were treated and regarded as one business and not as two separate enterprises is further indicated, we think, by the fact that the "considered" holdings of stock in the corporation by

the four individuals controlled and determined the distribution of profits from all activities. Except for the two shares purchased by Pershall and Hicks, neither Pershall, Jameson, nor Hicks bought any shares from Ross or the corporation and they paid nothing to any one for the right to share in the auction or trading profits, and so far as the recorded holdings of stocks were concerned, Ross continued to hold and own all shares except the two qualifying shares belonging to Pershall and Hicks. There is testimony, however, to the effect that an oral agreement was reached as to the number of shares of stock "considered as having been owned" by each of the individuals and to the effect also that the mule account was owned in the same proportions "as by oral agreement" the stock of the corporation "was considered as having been owned." According to Hicks and in keeping with that understanding, the "considered" stockholdings at January 1, 1934, were: Ross, 315 shares; Pershall, 130 shares; Jameson, 130 shares; and Hicks, 25 shares. This continued until June 30, 1934, when by oral agreement the holdings were changed and from that date to the time the corporation was dissolved the stock was "considered as having been owned" 315 shares by Ross, 110 shares by Pershall, 110 shares by Jameson, and 65 shares by Hicks. Except for a slight variation in 1936, the profits from all sources, auction and trading, and prior to the deduction of the equal salary allowances to Ross, Pershall, and Jameson, were divided and paid over, or credited to the four individuals according to the exact percentages indicated by the division of the stock shown above. This, we think, definitely signifies that the four individuals regarded the auction and trading activities as one enterprise. The fact that the total of the amounts received by each of the four corresponds to the amounts computed by use of such percentages carried to several decimal places can not in our opinion be attributed to mere accident. This conclusion is further strengthened by the fact that in making these computations consideration was given to the shift in the percentages which took place by agreement of the parties at June 30, 1934. Some question as to the force of these facts is raised by the petitioners because the percentages were made to apply without the elimination of the amounts allowed as salary to Ross, Pershall, and Jameson, but after the elimination of the salary paid to Hicks. If that point is of importance, the reason for such treatment may be found in the fact that the duties performed by Pershall and Harp, and later Jameson, were in the management and conduct of the auction and trading activities and in the actual production of the income distributed, while the duties performed by Hicks did not relate directly to the production of such income. He continued his duties in the office, and, so far as the record shows, neither his duties nor his salary were changed or affected by the bringing in of Pershall, Harp, or Jameson. It is true that the percentages do not reflect the payments

made to the parties for 1936 with the same mathematical exactness as in 1934 and 1935. The variations are not in our opinion substantial enough, however, to indicate any change in the business. Ross received approximately $110 in excess of the amount indicated by his percentage and Pershall, Jameson, and Hicks less by approximately $42, $42, and $25, respectively. The variations if expressed in the percentages were approximately an eighth of 1 percent for Ross, one-twentieth of 1 percent each for Pershall and Jameson, and one-fortieth of 1 percent for Hicks.

In support of their contention that the auction and trading activities were separate business enterprises and should be recognized as such for income tax purposes, the petitioners have made various computations designed to show that the profits from the trading activities and those from the auction or other sources were not distributed according to the same percentages. To illustrate: On the basis of those computations, the distributions from the W. R. Ross mule account in 1934 were 57.241 percent for Ross; 16.982 percent for Pershall; 16.982 percent for Jameson; and 8.795 percent for Hicks, while the distributions from commissions and other income were 52.51 percent for Ross; 19.48 percent for Pershall; 19.46 percent for Jameson; and 8.53 percent for Hicks. In connection with those computations, however, it is to be noted that they were applied after the exclusion of the salary allowances to Ross, Pershall, and Jameson and that these salary allowances were charged in full to the profits attributed to the corporation as distinguished from the profits from trading. It is also to be noted that they do not take into consideration the agreement reached by the parties on June 30, 1934, as to the change of "considered" stockholdings. Furthermore, they indicate a conclusion directly contrary to the testimony of one or more of petitioners' witnesses to the effect that the trading account was owned by the four individuals in the same proportions as "by oral agreement" the stock of the corporation "was considered as having been owned" by them.

After studying carefully the business activities carried on, the history as reflected by the evidence of record, the facts and data pertaining to those operations, the attitude and conduct of the parties in carrying on those operations, and the basis on which the profits were distributed, it is our conclusion that the two activities constituted one business enterprise, and it becomes unnecessary to consider the alternative contention of the respondent concerning the applicability of section 45 of the Revenue Act of 1934.

Petitioners have pleaded in the alternative that, if the above conclusion should be reached, we should hold that the business was conducted by the W. R. Ross mule account, a partnership, and not by Ross Brothers Horse & Mule Co., the corporation. We find no merit in that contention. That the corporation was regularly organized

under the law, with powers to carry on the business here attributed to it, is not open to question, and it continued in existence until its formal dissolution was effected under the law of Texas and in accordance with the resolutions adopted by its directors and stockholders on December 28, 1936. There is nothing in the record at all to support any conclusion that the auction business was not conducted by and did not belong to the corporation, and we have already stated our reasons for concluding that the auction and trading activities constituted a single business enterprise. The petitioners' alternative contention is denied.

For the year 1935 the petitioners, W. R. Ross and Mary Catherine Ross, filed separate returns, reporting their share of the income from the mule account as distributions from a partnership taxable at both normal and surtax rates. In the notices of deficiencies for that year the respondent stated that, since the taxpayers had not concurred in his determination that the mule account was a part of the Ross Brothers Horse & Mule Co., and in order to protect the interests of the Government, the distributions received by them from the mule account were treated as having been received from a partnership. In view of our decision on the principal issue, it follows that the distributions received by petitioners in 1935 constituted dividends of the corporation, subject only to surtax rates. That adjustment should be made on the recomputation hereunder.

In determining the deficiencies for 1937 the respondent held that the petitioner, Ross Brothers Horse & Mule Co., was not dissolved until September 17, 1937, and that the income received by it from the commission business during the interval from January 1, 1937, to the date of dissolution, as well as the income received by the mule account during the same interval, was taxable to the corporation for the year 1937. His determination on this point is based on the fact that the certificate of dissolution was not issued by the state authorities until September 17, 1937.

The petitioners contend that the corporation was dissolved on December 31, 1936, that on that date its assets and liabilities were transferred to a copartnership of the same name, that the capital was distributed to the stockholders, that the corporation did not exist or conduct any business at any time during the year 1937, and that therefore the respondent erred in determining that it received any taxable income in that year.

We think the petitioner's contention on this point must be sustained. Although the formal certificate of dissolution was not issued until September 17, 1937, all other steps necessary to effect the dissolution of the corporation were consummated on or prior to December 31, 1936, and, more important, even though technically it may have still been alive, the corporation after that date had no assets, conducted no

business, and received no income. The respondent's determination on this issue is reversed.

The respondent seeks to hold petitioner W. R. Ross liable as transferee of the corporation, Ross Brothers Horse & Mule Co., for the deficiencies determined against the corporation for the years 1934 to 1937, inclusive. In accordance with the resolutions adopted by its directors and stockholders on December 28, 1936, and in consideration for the assumption of its liabilities exclusive of capital stock, the corporation on December 31, 1936, transferred to a partnership of the same name assets in an amount which exactly equaled the liabilities so assumed and on the same date distributed its remaining assets exactly equaling its capital stock liability, $59,800 to Ross and $100 each to Pershall and Hicks. This was in addition to dividends and other distributions which had been paid to Ross during each of the taxable years and left the corporation without any assets whatsoever. It is argued on behalf of petitioner Ross that the claim that he is liable as transferee of the corporation is inconsistent and in conflict with the respondent's claim on the main issue in that the respondent there claimed that the stock of the corporation was owned in the same proportions in which the income of the mule account was shared. With respect to the argument advanced, it is necessary only to say that for the purpose of deciding this issue it matters not whether the respondent was of the view that the four individuals were the actual owners of the stock of the corporation in the proportions on which the profits were distributed, or whether he was of the view that the stock was owned 598 shares by Ross and one share each by Pershall and Hicks, as the stock account indicates, and that the "considered" ownership of the stock by the four individuals was for the purpose only of computing the distributive shares of the profits under a profit-sharing arrangement with Pershall, Jameson, and Hicks in return for the services which they were to render the corporation. The controlling fact here is that the assets of the corporation after the transfer of its business and facilities to the partnership amounted to $60,000 and this amount was distributed to the stockholders of record, $59,800 being paid to Ross and $100 each to Hicks and Pershall, leaving the corporation without assets. These facts bring the petitioner W. R. Ross within the transferee provisions of the statute and to the extent of such distribution he is liable as transferee. This liability is limited, however, to the years 1934, 1935, and 1936, in as much as the corporation, whether it remained in existence after December 31, 1936, or not, had no assets, conducted no business and received no income during the year 1937.

The last issue concerns the deductibility of the three bad debts described in our findings. It is the respondent's position that they were worthless when the promissory notes were executed by the

debtors and delivered to Ross, or in any event the debts became worthless prior to the year 1935. The petitioners contend that they had reasonable prospects of collecting the debts when the notes were received and that they became worthless and were properly ascertained to be so and charged off in 1935.

With respect to the Lake and Williams debts, we think the petitioners' contention must be sustained. In our opinion the facts show that up until 1935 the petitioners were justified in believing that they had some chance of collecting at least a part of those two debts. Without an extended discussion of the facts set forth in our findings, we think it will suffice to say that the record convinces us that the petitioners properly ascertained those two debts to be worthless in 1935 and charged them off in that year. We accordingly hold that they are entitled to the deductions claimed with respect thereto.

With respect to the Golightly debt, however, we have reached the opposite conclusion. Ross testified that at the time Golightly went out of the grocery business in the latter part of 1934, he made an effort to collect the debt and found that it was a "hopeless case." He did not, however, charge the debt off until some time in 1935. We accordingly sustain the respondent's determination that the Golightly debt was worthless and ascertained to be so prior to 1935.

*Decision will be entered under Rule 50.*