## ROSS v. COMMISSIONER OF INTERNAL REVENUE.
### No. 10173.

Circuit Court of Appeals, Fifth Circuit.

July 9, 1942.

---

[1] The writ, which obviously was a habeas corpus, was improperly labeled "order to produce."

Charles B. McInnis, of Washington, D. C., for petitioner.

Archibald Cox, Atty., Office of Sol. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., J. Louis Monarch, Sewall Key, and Newton K. Fox, Sp. Assts. to Atty. Gen., J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue and Vernon F. Weekley, Sp. Atty., Bureau of Internal Revenue all of Washington, D. C., for respondent.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

This case concerns deficiencies in income taxes for the calendar years 1934, 1935 and 1936 of a dissolved corporation, Ross Brothers Horse and Mule Company, assessed against W. R. Ross, its principal stockholder, as transferee. The Company did a large business, averaging nearly a million dollars per year, at Fort Worth, Texas, in selling horses and mules at auction for a commission of $2.50 a head. It rented its stock pens and auction ring, and used its own capital mostly in assisting purchasers and sellers at its auction sales to handle liens against the animals and otherwise temporarily to finance the sales. W. R. Ross indorsed for the Company at the banks to obtain additional money when needed. During the tax years he owned 598 shares of the stock, par value $100 per share, and John C. Hicks and D. H. Pershall each owned one share. The three, together with Parker Jameson, personally conducted the business, Hicks being the bookkeeper and office man, and Ross and Pershall and Jameson dealing with the customers. There were also hired underlings. The Company paid Ross, Pershall and Jameson each a salary of $6,000 and Hicks $2,400 per year. By agreement they shared the profits of the business, not according to their shares of stock, but as though Ross held 315 shares, Pershall 110 shares, Jameson 110 shares, and Hicks 65 shares. When the corporation was dissolved the assets were distributed 598 shares to Ross, one share each to Pershall and Hicks, showing that the different distribution of the corporate profits was a sort of compensation for services, or bonus, in addition to the fixed salaries.

At the same time Ross, Pershall, Jameson and Hicks, as partners, were carrying on a business of buying horses and mules at the auctions, and sometimes on the outside, and shipping and reselling them mostly into

other States. This also was a large business, and during the tax years was profitable. The profits were shared on approximately the same basis as the compensation each got from the Company's commission business.

■ The Board of Tax Appeals, sustaining the Commissioner, held the commission business and the buying and selling of animals by the partners was all one business, and all done for the Company, and that the profits should be aggregated and taxed to the Company, resulting in large deficiencies. 43 B.T.A. 1155. There is no conflict in the testimony. The primary facts are undisputed. Only the ultimate inferences and the legal consequences are in contention, so that a mixed question of law and fact is presented on which the Board's conclusion is not final here. Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 491, 57 S.Ct. 569, 81 L.Ed. 755. We think the aggregation of the two businesses is not justified, for reasons which follow.

With some changes in the persons engaged, the two businesses have been carried on separately since the Company was incorporated in 1916. W. R. Ross and his two brothers then owned the businesses. Ross was interested in horses and mules, and his brothers in cattle. They then agreed that the corporation should do only a commission business, and that Ross should buy horses and mules on his own account only, but in consideration of his supporting the Company's auction sales by appearing as a buyer, he should not be charged a commission if he should sell any animal at auction, as he sometimes did. The brothers later sold their interest in the Company and Ross took others in to work with him, but the commission business of the Company was always kept and intended to be separate from the buying and selling ventures of Ross and his associates. Books were kept accordingly, profits separately declared and distributed, and income taxes were returned and paid separately by the corporation and by the partners. In 1933, an examiner of the Revenue Department suggested that the partners ought to file a partnership information return, and it was done in that and subsequent years. No other objection or criticism was then made.

■■ In 1933 and the years immediately preceding, business was not good, and in several of them there was a loss by the corporation and a profit by the partnership, or vice versa, so that had the businesses been aggregated then, as is now attempted, the profit would have been reduced or wiped out by the loss, to the taxpayer's advantage. It is argued that the Commissioner, having taken the benefit of separate returns then, and ratified them by suggesting a partnership return, is estopped to take the contrary position now, when to do so is disadvantageous to the taxpayer. Reliance is put upon our language in Alamo Natl. Bank v. Commissioner, 5 Cir., 95 F.2d 622. We do not retract or modify what was there said but do not think it controls here. It was not the Commissioner, but only a revenue agent who in the present case suggested a formal partnership return. Revenue agents have no authority to estop the United States by their suggestions to taxpayers. No change indeed in the position of these taxpayers was suggested or induced. They had elected to separate the business of the corporation from that which they as individuals were doing, and had so returned the two businesses. The agent simply suggested that a partnership return for information was proper in such a situation. There was nothing done or said that could estop the United States from enquiring then or in a later year whether there was indeed a separate partnership business. That enquiry is in order now.

This corporation could, according to its charter, have bought and sold horses and mules, and even raised them, in addition to the commission business mentioned in the charter. But its owners could of course exercise fewer than all its powers. The evidence is clear here that they chose to do through the corporation only a commission sales business. The Company rented extensive stockyard facilities, and sought by service to its customers and by obtaining good prices at its weekly auctions, to attract a large and profitable commission business. It had between three and four hundred regular customer's accounts, and through its own books kept track of each customer's purchases or sales and made him necessary advances, honoring drafts much as a bank would. The commission was charged only to the seller, and a second commission was not charged if a buyer, regretting his purchase, reoffered for sale. Feeding and like services were also charged for and were a source of profit. Everything was done according to established custom in such commission businesses.

Now Ross' outside purchasing activities were in no conflict with the Company's

business. The auctions were conducted by auctioneers who did not represent the Company. The Company was neither buyer nor seller, but served the sellers in finding the highest bidders. Ross, bidding openly and with the knowledge of all, helped to keep prices up. Except on rare occasions he and his associates never sold at the Company's auctions. They thus seldom owed a seller's commission, and their help to the sales as buyers was esteemed of more value to the Company than the rarely incurred commission, which therefore by a special agreement was never charged to them. Otherwise, Ross and his associates, under the firm name of W. R. Ross Mule Account, were treated by the Company exactly like any other customer. They had on the Company's books an account which showed every transaction of purchase and sale, feed bills and other expenses; they drew drafts which were honored and charged, and made deposits of checks and cash, just as others did. There were three other firms among the customers of the Company in each of which Ross and his associates had a half-interest. These also had their several accounts and transactions with the Company in the same way. Half the profits of these partnerships were annually paid over to Ross and his associates and were included in their partnership gains. There was no confusion or mingling at all with the Company's affairs. The Company was in effect the bookkeeper and banker of all, but only in the same manner as it was bookkeeper and banker for other customers. And this was all customary in such commission businesses.

It is true that Ross, Pershall, Jameson and Hicks were working at the same time for the Company and for themselves, and there was no separation of their working hours, and that as between one another they arranged to divide their earnings from the Company and the partnerships on a similar though not identical basis. One might think that they were using the corporation as "another pocket", so that the corporate entity might be disregarded and the entire business, for some purposes, be considered to be their business as individuals. But that is not ordinarily to be done in tax matters. It is lawful to obtain a corporate charter, even with a single substantial stockholder, to engage in a specified activity, and that activity may coexist with other private business activities of the stockholder. If the corporation is a substantial one, conducted lawfully and without fraud on others, its separate identity is to be respected. The tax laws of the United States recognize corporations; they tax them differently and sometimes discriminatorialy. In tax matters it' is only under der exceptional circumstances that the separateness of the corporation from the stockholders can be disregarded, even when there is but one stockholder. Burnet, Commissioner v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397; Burnet, Commissioner v. Commonwealth Improvement Co., 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399. There is no doubt about the reality and good faith of the present agreements and transactions, and the separateness of these lines of business has been consistently maintained at all times, even when it would have saved taxes if they had been merged. We do not think any circumstances appear which authorize the tax officers to treat as business of the corporation the activities of stockholders which were never intended to be undertaken by the corporation and for which it could not have been held answerable.

Section 45 of the Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev.Code § 45, gives the Commissioner authority to apportion or allocate income or deductions between businesses controlled by the same interests, as in this case, if he determines that this is necessary to prevent tax evasion or to clearly reflect income. So far from justifying the consolidation of such businesses, this section recognizes and preserves their separateness, and seeks only to adjust and correct what may have been improperly done in the bookkeeping between them. The Commissioner in making these assessments here did not mention Section 45 or make any of the determinations necessary to apply it. He simply held the partnership income to be part of the corporate income, a conclusion which we think is not supportable. In an amended answer before the Board he set up an allocation between the two businesses of deductions according to gross income for each year, but did not allege any finding of tax evasion or failure to reflect true income. The Board, holding there were not two separate businesses, did not pass on this effort belatedly to apply Section 45. Neither do we, but leave that matter open.

By stipulation the judgment in this case will also be entered in No. 10,174, Ross

Bros. Horse & Mule Co. v. Commissioner, which involves taxes for the year 1937.

The decision of the Board of Tax Appeals is reversed, and further proceedings will be had not inconsistent with this opinion.