**UNITED STATES GYPSUM COMPANY,**
Appellant/Cross-Appellee,

v.

**SCHIAVO BROTHERS, INC.,**
Appellee/Cross-Appellant.

Nos. 81–1168, 81–1272 and 81–1273.

United States Court of Appeals,
Third Circuit.

Argued Sept. 22, 1981.

Decided Nov. 30, 1981.

Rehearing Denied Dec. 23, 1981.

Certiorari Denied May 3, 1982.
See 102 S.Ct. 2038.

## 174

Michael M. Baylson (argued), Duane, Morris & Heckscher, Philadelphia, Pa., for appellant/cross-appellee, U. S. Gypsum Co.

John M. Elliott (argued), Constance B. Foster, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for appellee/cross-appellant, Schiavo Bros., Inc.

Before ALDISERT, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

### I.

While one man's junk may be another man's profit, there comes a point where clearing junkyard remnants constitutes a substantial financial cost. Here we are required to decide whether under Pennsylvania law the landlord or the primary lessee should bear the costs of clearing the junk left by the sublessees in this case. During the last three years, two district judges have been sorting out the appropriate property and damage doctrines to determine who pays for removal of the junk and other alleged damages arising out of the tenancy. We will affirm the rulings of the district court except as to its decision not to consider the issues of holdover rent and loss-of-use of purchase monies, and we will remand for further proceedings on those two claims.

### II.

The facts of this case have been set forth twice, at length, in two different district court opinions, reported at 450 F.Supp. 1291 (E.D.Pa.1978) and 485 F.Supp. 46 (E.D.Pa. 1979). We therefore only summarize them here.

The plaintiff, United States Gypsum Company (Gypsum) owned a landfill in southwest Philadelphia. In 1966, it entered into a lease agreement with the defendant Schiavo Brothers, Inc. (Schiavo). Gypsum and Schiavo also agreed by separate contract that Schiavo, a waste hauling firm, would haul waste for Gypsum. Schiavo sublet part of the property to automobile junkyard operators. Schiavo's lease with Gypsum was lawfully terminated by Schiavo, effective January 1, 1974, but most of the junkyard dealers (the sublessees) refused to leave until well into the summer of 1974. Meanwhile Gypsum had agreed to sell the property to Swann Oil Company, but the sale was delayed, allegedly because Swann would not accept transfer of the property until all of the debris left by the junkdealers had been cleared. That debris covered most of the property and included car seats, tires and other by-products of junkyard dealing. When the junkdealers finally left, Gypsum was obliged to hire a contractor to clear the debris. After the debris was cleared, Gypsum transferred the property to Swann in September, 1974, almost four months later than both parties had planned.

Gypsum sued Schiavo for the cost of the cleanup, for holdover rent[1] and for damages compensating it for the loss of the use of the money due from Swann that was not received until after the clean-up. Jurisdiction was founded on diversity of citizenship, and the law of Pennsylvania governs the action.

The case was assigned to the calendar of Judge Herbert A. Fogel, who ordered that liability and damages be tried separately. Trial on liability issues began in November, 1975 and continued, intermittently, into

---

1. A holdover tenant is one who fails to abide by the term of a lease requiring the tenant to vacate on an agreed date. *Katzman v. Hoffman*, 242 F.2d 354, 358 (3d Cir. 1957). We use the term "holdover rent" to apply to all of the damages, rent and others, sought by Gypsum for Schiavo's occupancy of the premises beyond the termination of the lease. *See* Restatement (Second) of Property, Landlord and Tenant, §§ 14.5, 14.6 (1976) for a discussion of the various types of damages recoverable from a holdover tenant.

January, 1976. Judge Fogel filed his judgment shortly before he resigned in May, 1978.

Judge Fogel ruled that under Pennsylvania law there was, implied in the lease between the parties, a covenant by Schiavo to return the leasehold property in the condition in which it received it, reasonable wear and tear excepted. He ruled that that covenant is a part of a tenant's obligations under a lease unless it is negated by contrary language in the lease, and that no such contrary intent was expressed in the lease at issue. He also found, however, that Schiavo had not breached the contract, and that in the context of the junkyard industry, the leaving of the debris was reasonable wear and tear to the property. He entered judgment in favor of Schiavo without mentioning the issues of holdover rent and loss of use of purchase monies.

Judge Louis H. Pollak was assigned the case after post-trial motions had been filed by both sides. He agreed with Judge Fogel that the implied covenant existed, but he reversed Judge Fogel's conclusion that Schiavo had not breached the covenant. He ruled that the debris exceeded reasonable wear and tear, and he therefore ordered a trial on damages relating to breach of the covenant. He also ruled, initially, that Judge Fogel should have entered findings on holdover rent and loss of use of purchase monies. However, upon a motion for reconsideration filed by Schiavo, Judge Pollak decided that Gypsum had not placed its claims "in so clear a focus as to warrant my concluding that (1) the claims were actually litigated, and (2) Judge Fogel erred in not ruling on them." 485 F.Supp. at 56. He therefore denied Gypsum any relief on the claims of holdover rent and loss of use of purchase monies.

After trial of damages Judge Pollak awarded Gypsum $96,815.00 to compensate it for its expenditures in clearing the debris caused by Schiavo's subtenants. He denied Gypsum's request for an award of prejudgment interest. He also dismissed, on the basis of res judicata, a second complaint brought by Gypsum seeking to recover holdover rent and loss of use of purchase monies.

Both parties appealed. Schiavo challenges the rulings of Judge Fogel and Judge Pollak that any implied covenant existed. Gypsum challenges Judge Pollak's rulings precluding recovery for holdover rent and loss of use of purchase monies, his dismissal of the second action, his refusal to award prejudgment interest, and his refusal to disburse to Gypsum certain escrow funds held by Schiavo.

## III.

### Existence of the Implied Covenant

Schiavo vigorously disputes the rulings of both Judge Fogel and Judge Pollak that there existed an implied covenant in the agreement between the parties that Schiavo would return the property in the condition in which it received it, reasonable wear and tear excepted.

Schiavo implicitly concedes that under Pennsylvania law, the covenant exists unless it is, in some manner, negated. However it argues that the integration clause in the lease *did* negate any implied covenants. The integration clause said in part:

It is expressly understood and agreed by and between the parties hereto that this lease and the riders attached hereto and forming a part hereof set forth all the promises, agreements, conditions and understandings between the Lessor and or its Agent and Lessee relative to the demised premises, and that there are no promises, agreements, conditions, or understandings, either oral or written between them other than are herein set forth.

 Although there is some force to Schiavo's contention, we have concluded that the courts of Pennsylvania would hold that the covenant was not negated by the integration clause at issue. The obligation of a tenant to return the leasehold property in the condition in which it was received, reasonable wear and tear excepted, is fundamental to the landlord-tenant relationship, even in a commercial setting. A land-

lord is entitled to presume that the tenant has implicitly promised not to waste the property. For that reason, only the clearest negation of the obligation will overcome the landlord's lawful expectation. We agree with Judge Fogel's discussion of the issue (450 F.Supp. at 1304), and affirm the district court's ruling on the point.

## IV.

### Breach of the Implied Covenant

Schiavo also appeals Judge Pollak's determination that it is liable for $96,815.00, Gypsum's costs in clearing the debris that was left by Schiavo's subtenants.

Judge Fogel placed great weight on the trial evidence showing that "upon termination of a junkyard lease, the dealer rarely, if ever, cleared the property of accumulated debris...." 450 F.Supp. at 1306. He ruled that the implied covenant to return the property in the condition in which Schiavo received it, reasonable wear and tear excepted, had not been breached:

> We find ... that USG has failed to meet its burden of establishing that, in the context of the junk car industry, the wear and tear to the land was excessive or unreasonable.

450 F.Supp. at 1305.

Part of Gypsum's timely motion for a new trial sought reconsideration of Judge Fogel's finding that the wear and tear inflicted on the property was reasonable. In a thoughtful opinion Judge Pollak ruled that he was empowered to reconsider Judge Fogel's conclusion on reasonableness; that, in his opinion, the Pennsylvania courts would not give controlling effect to industry custom; and that the wear and tear inflicted by Schiavo was not reasonable.

■ The parties disagree on whether the "reasonableness" determination is a finding of fact or a conclusion of law. Generally, where the primary facts are undisputed and only ultimate inferences and legal consequences are in contention, a question of law is presented; or, by some formulations, a mixed question of fact and law subject to review as a question of law. *Ross v. Commissioner of Internal Revenue*, 129 F.2d 310, 312 (5th Cir. 1942). *See also* 9 Wright and Miller, Federal Practice and Procedure (2d Ed.), § 2589, at 753; *Fleer Corporation v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 154 (3d Cir. 1981); *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 267 (3d Cir. 1970), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).[2]

In this case, only the legal consequences of Schiavo's conduct, and not the particulars of the conduct itself, were in issue before Judge Pollak. He was asked to decide whether the law of landlord and tenant in Pennsylvania would hold Schiavo liable for damages because of the undisputed condition of the property after the termination of the lease. That determination is essentially a legal one.

■ We conclude that where a successor judge is asked by timely and proper motion to reconsider the legal conclusions of an unavailable predecessor, he or she is empowered to reconsider those issues to the same extent that his or her predecessor could have. Our conclusion rests on three grounds. First, we are bound by clear precedent of this court:

> The petitioners base their claim for relief ... upon the rule that judges of co-ordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other .... [citations omitted]

2. Other courts have held that, where the basic facts are not in dispute, ultimate questions of "reasonableness" are mixed questions of fact and law, subject to plenary review on appeal. See, *e.g.*, *Slisz v. Munzenreider Corp.*, 411 N.E.2d 700, 710–11 (Ind.App.1980); *Wurlitzer Co. v. Strand Enterprises*, 32 N.E.2d 62, 63 (Ohio App.1936). The standard of review is of course different where the issue is how a rea-

sonable *person* would have acted in a like situation—a determination that is peculiarly one for the factfinder. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 n.12, 96 S.Ct. 2126, 2132 n.12, 48 L.Ed.2d 757. *Compare* 9 Wright and Miller, *supra*, § 2589 (mixed questions of fact and law generally subject to plenary review), and *Id.*, § 2590 (negligence finding subject to "clearly erroneous" review.)

. . . .

[T]here may be exceptional circumstances under which the rule is not to be applied. Such circumstances exist when the judge who made the original decision is not available to consider the application to rehear and reverse his decision. If the judge who made the decision dies or resigns from the court he obviously is no longer available to consider it and such consideration must perforce be by another judge if it is to be had at all.

*TCF Film Corporation v. Gourley,* 240 F.2d 711, 713–14 (3d Cir. 1957) (affirming successor judge's reversal of a denial of leave to amend complaint). We have held the rule to apply where a "mixed question of fact and law" is presented; that is, where the primary facts are not in dispute but ultimate inferences and legal conclusions are. *Ryans v. Blevins,* 258 F.2d 945, 946 (3d Cir. 1958) (successor judge's reversal of his predecessor's application of the "last clear chance" doctrine to undisputed facts).

■ Second, were we to hold that Gypsum was not entitled to have its request considered by Judge Pollak, we would effectively be denying it its right to move for reconsideration—a right recognized by the Federal Rules,[3] and the Local Rules of Civil Procedure of the Eastern District of Pennsylvania, where this case was tried.[4] A litigant's right to try to persuade a court that it has erred should not be denied simply because of the unavoidable unavailability of the judge who rendered the original decision.

Third, we agree with the succinct reasoning of the Seventh Circuit in a similar case:

**3.** See Rules 52(b), 59 and 60. *Cf.* Rules 15(b), 16.

**4.** Local Rule 20(g), E.D.Pa. Two of the other district courts in this circuit—the Districts of New Jersey and Delaware—likewise provide for reconsideration by Local Rule: Local Rule 12(I), D.N.J.; Local Rule 3.3, D.Del.

**5.** Section 12.2(1) says:
Permissible changes by the tenant—Except to the extent the parties to a lease validly agree otherwise, the tenant is entitled to make changes in the physical condition of the

Regardless of the impact of any law-of-the-case rule, our duty is to determine whether the judgment of Judge Miner [a successor judge] is correct. In fact we should sustain any judgment from which an appeal has been taken if it is supported by the record and the law . . . . Obviously we cannot be expected to reverse a correct decision by one district judge simply because we find that it is contrary to a prior ruling by another district judge in the same case . . .

*Parmelee Transportation Co. v. Keeshin,* 292 F.2d 794, 797 (7th Cir. 1961). It remains for us to decide, however, whether we agree with the legal determination of Judge Pollak, who ruled as follows:

[T]he fact that . . . junkdealers are "in general, an extremely difficult group with whom to deal . . . and that upon termination of a junkyard lease, the dealer[s] rarely, if ever, cleared the property of accumulated debris", should not, without more, immunize them (or those responsible for them) from liability. Such behavior was not "reasonably necessary in order for the [junk car dealers] to use the leased property in a manner that [was] reasonable under all the circumstances." Restatement 2d of Property, Landlord-Tenant, Section 12.2.

485 F.Supp. at 52.[5]

Although Judge Pollak's interpretation of the obligations imposed on a tenant by § 12.2 is phrased somewhat differently from Judge Fogel's discussion of the "reasonableness" of the wear and tear, *supra,* in fact each used virtually the same standard. Comment d to § 12.2 provides in relevant part:

leased property which are reasonably necessary in order for the tenant to use the leased property in a manner that is reasonable under all the circumstances.

We agree with Judge Pollak that, because of the absence of clear Pennsylvania precedent on many of the points at issue, our analysis in this diversity case is, by necessity, largely predictive. Most of our citations to the Restatement are meant to encompass our prediction that the courts of Pennsylvania would adopt the cited principles.

No matter what use of the leased property is determined to be reasonable under all the circumstances, normal wear and tear on the leased property by that use is not only reasonably necessary, but reasonably to be expected by the parties, absent an agreement otherwise....

Because "normal wear and tear" is *per se* a part of that which is "reasonably necessary in order for the tenant to use the leased property in a manner that is reasonable under all the circumstances," the fundamental question decided by both Judge Fogel and Judge Pollak was whether the wear and tear imposed on the property was "reasonable." Restatement (Second) of Property, Landlord-Tenant, § 12.2(3).

When determining what constitutes "wear and tear" for a junkyard or landfill we write on a clean slate, since we have not found, and no one has called to our attention, any prior cases defining "wear and tear" in such a context. Even the references to wear and tear in the Comments to the Restatement include such traditional examples as the wearing down of refinished floors and the leaving of holes caused by picture hooks—instances in which wear and tear seems to imply some gradual wearing. In this case instead of wear and tear we have a "dump and add" phenomenon. Nevertheless, the central issue is the same as that in more traditional wear and tear cases, *i.e.*, whether the condition of the property, viewed in light of its potential for sale or re-rental, has deteriorated so unreasonably that the tenants, rather than the landlord, should be required to pay for its restoration. We therefore have little difficulty in concluding that "wear and tear" is at issue.

In this case a landlord leased a largely vacant piece of land in January of 1966. 450 F.Supp. at 1298. A relatively small part of that property was sublet to junkdealers. The land was returned about one hundred and three months later, sometime in the summer of 1974, with debris "spread generally throughout the leasehold area."[6] *Id.* at 1301. Gypsum received ninety-six months' rent for its property, a total of about $191,500. Yet Gypsum was required to pay $96,815.00—more than half of the rent it received during the eight years—to clean the debris caused by Schiavo's subtenants.[7] Moreover, Gypsum was saddled with the dual aggravations of arranging for the clearing of the property and having to wait for that process to be completed. We agree entirely with Judge Pollak that the Pennsylvania courts would not require a landlord to pay for the kind of behavior engaged in by the junkdealers in this case. The leaving of massive amounts of debris on otherwise vacant property to the significant detriment of the landlord is, in our crowded age, unreasonable wear and tear, regardless of whether the industry involved makes a habit of it. As between Gypsum and Schiavo it is Schiavo who must bear the cost of the clean-up because it was Schiavo who chose to rent to the largely judgment-proof junkdealers. Certainly, Gypsum foresaw that Schiavo would lease to junkdealers, but that foresight hardly solves the problem of which party to the agreement ought to pay for the conduct that occurred. We conclude that under the law of Pennsylvania, the wear and tear inflicted was unreasonable, and Schiavo should compensate Gypsum for it.

---

6. The area that was *not* free of debris in 1966 was returned in 1974 in as good or better condition than that in which it was rented.

7. Schiavo contended at trial that Gypsum realized $17,000 per year in synergistic savings by entering into the combined leasehold/waste-hauling agreement with Schiavo. Our review of the record indicates that Gypsum, for its own reasons, had insisted on an arm's length hauling rate separate from the lease. (App. at 1125). Nevertheless, even if Judge Fogel had found as a fact that Gypsum indeed saved money from the combined leasehold/hauling agreement, it is clear that it would have saved but $34,000 in the first two years and at most $34,000 between 1968 and 1972 after its waste hauling needs had declined by sixty per cent (the landfill operation closed in 1972). Even if those savings had been viewed as additional rent, the total rent would have been about $259,000. The cost of clearing the debris caused by the subtenants remains $96,815, or almost forty per cent of the total "rent"—hardly reasonable to ask a landlord to accept.

## V.

*Gypsum's Requests for Rulings on Claims*

It is often difficult for a trial judge hearing a case to determine whether counsel has presented a claim with sufficient specificity to put opposing counsel on notice to defend it, or whether in the course of pretrial and trial proceedings counsel has waived the claim. The problem of ascertaining whether there was or was not a waiver of a claim is even more difficult when a judge must decide on a cold record what was waived or litigated before his or her predecessor. Yet, this is the troublesome problem that Judge Pollak was required to adjudicate—*i.e.* whether "the Court [Judge Fogel] failed to rule on two of its [the plaintiff's] damage claims," 485 F.Supp. at 51, or whether " 'the failure to enter findings with respect [to these claims] is tantamount to findings adverse to [the claimant]' " *Id., quoting Switzer Brothers, Inc. v. Locklin*, 297 F.2d 39, 46 (7th Cir. 1961).

Judge Pollak originally concluded that "the failure to enter findings on these two claims was oversight, and one which Judge Fogel would have been required to correct had he still been on the bench when plaintiff's motion was filed. As his successor, I am equally obliged to reopen the judgment . . ." 485 F.Supp. at 51–2. However, upon a motion for reconsideration filed by Schiavo Judge Pollak reversed his ruling:

> I have concluded that the presentation of these two damage claims [holdover rent and loss of use of purchase monies] at the trial before Judge Fogel did not place them in so clear a focus as to warrant my concluding that (1) the claims were actually litigated, and (2) Judge Fogel erred in not ruling on them. It was, therefore, inappropriate for me to re-open the record as to these claims. I will vacate that portion of my May 22 order.

*Id.* at 56.

▮ After Judge Fogel's findings were filed, Gypsum presented a motion and mem-

orandum of law captioned "Motion for a New Trial" (essentially, a Rule 59 motion) as a part of which it sought additional findings of fact and conclusions of law under Rule 52, Fed.R.Civ.P.[8] Rule 52(a) provides in part:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; . . . . Requests for findings are not necessary for purposes of review . . . .

Rule 52(b) provides in part:

> Upon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a motion for a new trial pursuant to Rule 59 . . .

The claims on which Gypsum sought rulings in its post-trial motion were those relating to Schiavo's liability for holdover rent and loss of use of purchase monies.

### A.

*Holdover Rent*

▮ Two years after the conclusion of a complex trial, Judge Fogel rendered findings of fact and conclusions of law which omitted any discussion of the issue of holdover rent that Gypsum believed it had litigated. The Rules recognize that judges will occasionally overlook issues, especially in a complex case. In a *jury* case Rule 51 affords counsel the opportunity during trial to call the court's attention to claims upon which counsel believe the jury should be charged, even after the court has given all of the instructions that it had intended to give. In a non-jury case, of course, counsel will not always know which issues the court has been considering until it has rendered its findings of fact and conclusions of law,

---

8. We agree with Professor Moore that "Since the time periods for the various motions [Rule 52(b) and Rule 59(a) and (e)] are identical and the motions are closely related, a movant should not be prejudiced by an erroneous rule reference, but should be granted whatever relief his motion shows him to be entitled." 6A Moore's Federal Practice ¶ 59.04[6] (2d Ed.).

**180**

and, normally, a judgment. Rule 52(b) was designed to deal with exactly the sort of problem raised by Gypsum in its post-trial motion. It permits counsel to ask the court to correct, on the non-jury record before it, any errors of law, mistakes of fact or oversights that require correction.[9]

Rule 59(a) complements Rule 52. When the trial record before the court in a non-jury case is infected with "manifest errors of law or fact," 6A Moore's Federal Practice ¶ 59.07 (2d Ed.) (and cases cited), the court may order a new trial on some or all of the issues in the case. A new trial is sometimes the only effective way to cure the prejudice resulting from errors or oversight, and if that is the case a new trial must be ordered. Very often, however, corrections can be made without reopening the trial record.

Where a new trial is not ordered, the trial record must support whatever additional findings of fact or conclusions of law a party seeks under Rule 52(b) or it is certainly not entitled to them. That entitlement

also depends, as Judge Pollak recognized, on what the trial court required the moving party to prove. *See* Rule 16, Fed.R.Civ.P.

This case therefore compels us to examine, in some detail, exactly the situation Gypsum faced at the beginning of trial. Judge Fogel bifurcated the trial into liability and damages phases.[10] Indeed, that was Judge Fogel's practice in virtually every civil case on his calendar, as reflected in his standing pretrial order. (App. at 32). Gypsum alleged in its complaint that "As a result of defendant's breach of its covenants to surrender complete possession of the premises to the plaintiff on the date of termination, January 1, 1974, plaintiff has suffered damages in the amount of the rental value of the property from the date of termination to the date Swann was ready, willing and able to proceed to settlement under the agreement of sale of the leasehold property, but for the presence of the debris." (Complaint ¶ 23).[11] Gypsum included, in its pretrial Proposed Findings of Facts, a finding that "Schiavo notwithstanding that it terminated the lease with

**9.** Although Rule 52(b) does not explicitly refer to reconsideration of conclusions of law, it is clear that the district court has the power under Rules 52(b) and 59(e), read together, to alter or add to its conclusions of law where appropriate. See 5A Moore's Federal Practice ¶ 52.11[2] (2d Ed.). *Cf. Parmelee Transportation Co. v. Keeshin, supra,* 292 F.2d at 797. Factual determinations are correctable under Rule 52(b) if the district judge who heard the evidence believes that they are necessary, and capable of being made without the grant of a new trial. We hold in this case that a successor judge is generally empowered to decide a reconsideration motion in the same way his or her predecessor could have. However, like the court in *Ryans v. Blevins, supra,* 258 F.2d at 945, we do not address whether a successor judge is, under any circumstances, empowered by Rule 52 to add to or alter the *factual* determinations of the predecessor judge who heard the trial evidence. That situation very likely presents an exception to our holding that the successor judge steps completely into his or her predecessor's shoes in deciding a Rule 52 motion.

**10.** Bifurcation of liability and damages is permitted by Rule 42(b), Fed.R.Civ.P.

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy,

may order a trial of any . . . separate issue . . ."

**11.** The phrase "but for the presence of the debris" refers only to Swann's unwillingness to purchase the property before it was cleared of debris. That stipulation was part of Swann's contract of sale with Gypsum. The date Swann was "ready, willing and able to proceed to settlement . . . but for the presence of the debris" was approximately June 1, 1974, more than three months before the debris was cleared. We do not construe the phrase "but for the presence of the debris" in this paragraph to be intended to amplify the allegation that Schiavo failed to "surrender complete possession of the property," (although it is possible that the debris itself was sufficient to deprive Gypsum of possession of certain parts of the property at the time.) Rather, the paragraph as a whole refers to the period of time between January and June in which (1) some of Schiavo's subtenants were still in possession of parts of the property and holdover rent was the only remedy at issue, and (2) at the end of which (approximately June 1) loss of use of purchase monies first became a conceivable element of damages (*i.e.,* Swann was ready to settle but for the presence of the debris). In short, ¶ 23 is a "holdover tenants" paragraph and not a "holdover debris" paragraph. See 485 F.Supp. at 56.

Gypsum, did not vacate the leasehold property as of January 1, 1974." Gypsum listed as "Contested Issues" in the joint pretrial order "Whether Schiavo is liable to United States Gypsum for damages .... (b) for rent from February 1, 1974 to September 26, 1974, at $1,667.67 per month [and] (c) For the loss of the use of $1,282,895 from June 1, 1974 to September 26, 1974."

Gypsum *proved* that the lease existed, that Schiavo terminated it, and that the termination was effective as of January 1, 1974, or at the latest, February 1, 1974. 450 F.Supp. at 1299; Exh. P. 58. Gypsum also proved that "only one of the dealers vacated his lot [as of December 31, 1973]", 450 F.Supp. at 1300; that the "other dealers formed an association to fight eviction," *Id.*; and that "[d]uring the course of the summer of 1974, the junk car dealers gradually vacated the premises," *Id.*

Unfortunately, one lawyer's liability issue is another lawyer's damages issue. For example, a claim for five months of holdover rent can be viewed in at least two ways. There can be liability for some holdover rent, with the length of the holdover being a damages issue; or there can be liability for five different months of holdover tenancy, with a later damages determination involving, in a simple case, only a multiplication of a monthly number by five.

In discussing bifurcation of liability and damages under Rule 42(b) in a slightly different context (an antitrust case in which proof of injury was an element of liability) the Fifth Circuit observed:

> The use of this trial procedure [bifurcation of liability and damages] must be grounded upon a clear understanding between the court and counsel of the issue or issues involved in each phase and what proof will be required to pass from one phase to the next.

*Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1324 (5th Cir. 1976).

12. Generally, pretrial orders under Rule 16 are to be liberally construed to embrace all legal

In this case, Judge Fogel made it clear at the final pretrial conference that liability and damages issues would be strictly separate:

> MR. ELLIOTT [counsel for Schiavo]: This is a bifurcated trial. I think damages are inappropriate. I haven't put any facts in as to the damages because of the standing pretrial order which says—
>
> THE COURT: I think that's right. That is correct because I said I want to bifurcate as to liability first.
>
> MR. BAYLSON [counsel for Gypsum]: Does that mean I don't have to be prepared for damages?
>
> THE COURT: No, because what I will do is when the testimony is completed, obviously, I think in a case of this importance to both sides you would probably want the transcript with a right to submit any supplemental data you may want as to what develops.
>
> MR. BAYLSON: Okay.
>
> THE COURT: Therefore, you don't have to go to the expense or trouble of putting on any damage witnesses.
>
> MR. BAYLSON: Fine.

Unfortunately, Judge Fogel did *not* clarify with counsel where the dividing line between liability and damages was to be.

The touchstone, in reviewing bifurcated proceedings, is whether the party bearing the burden of proof was unfairly prejudiced by the procedures employed. Rule 42(b) permits bifurcation to "avoid prejudice," not to create it.

Judge Fogel's standing pretrial order, the joint pretrial order and the transcript of the pretrial conference do not reflect the clear separation of issues into liability and damages, nor the "clear understanding [of] . . . what proof will be required to pass from one phase to the next" (*Response of Carolina, Inc.*, 537 F.2d at 1324), that would have been necessary before Gypsum could be charged with having waived certain points by not having litigated them aggressively enough in the liability phase.[12]

and factual theories inherent in the issues defined therein. *Century Refining Co. v. Hall,*

Counsel for Gypsum could reasonably have concluded that his obligations during the liability phase were to plead the holdover tenancy,[13] to offer to prove a failure to surrender possession, and to prove that Schiavo failed to surrender possession of *some* part of the premises for *some* period of time after the termination of the lease. Gypsum, in fact, met each of those requirements. Calculations of the time of the holdover and the acreage unlawfully possessed are reasonably susceptible of being called questions of damages.

Certainly, Judge Fogel could have required more extensive proof of "liability" for holdover tenancy, for example, proof of the number of months the sub-tenants were in possession. Nevertheless, he did not, and it would be unfair to penalize Gypsum for not having done what it was never required to do.

▮ A holdover tenant is one who unjustifiably refuses to surrender possession of a leasehold premises at the end of the term of the lease. *See* n. 1, *supra*; Restatement (Second) of Property, Landlord and Tenant, § 14.1. The landlord may sue such a holdover for possession and to recover whatever damages it suffered as a result of the tenant's actions. *Taylor v. Kaufhold*, 368 Pa. 538, 544, 84 A.2d 347, 350 (1951). Schiavo chose, as a tenant, to sublet the property to subtenants, and their presence after January 1, 1974 is imputable to Schiavo. *Id.* Certainly it *appears* that Schiavo wrongfully denied Gypsum possession of some part of the leasehold property for some period of time after the termination of the lease.

▮ We conclude, therefore, that Judge Pollak could have entered a conclusion of law on Schiavo's liability *vel non* for holdover rent; that is, there is a sufficient

record upon which to base such a determination. It would be inappropriate, however, for us to make that determination, because we have not been briefed as to what legal defenses Schiavo may have had, given Judge Fogel's findings of fact and other facts not in dispute.[14] Moreover, Rule 52(a) reposes in the district court the responsibility for entering *initial* rulings on each issue raised at trial. We will therefore remand the case to the district court for an examination of the record of the trial before Judge Fogel, a conclusion of law as to liability for holdover rent, and, if necessary, further proceedings on damages for the holdover.

### B.

### *Loss of Use of Purchase Monies*

▮ Much of our discussion of the holdover rent issue applies to Gypsum's claim for loss of use of purchase monies. Judge Fogel did not reach the issue, and Judge Pollak ruled that Gypsum had waived it. Judge Fogel had found that

". . . USG had arranged for the sale of the leasehold property to Swann Oil Company (Swann), as part of the agreement of sale, dated January 18, 1974; closing was made conditional upon all debris being removed from the land. It was thus vital to USG's interests that the property be cleaned.

. . . .

During the period when the dealers were vacating the premises, Schiavo denied that it was its responsibility to remove the debris left by the dealers, or the debris accumulated through fugitive dumping. As a result, in order to guarantee that the sale of the property to Swann would go through, USG was forced to hire a private contractor,

---

316 F.2d 15, 19–20 (10th Cir. 1963); *Peter Pan Seafoods, Inc. v. United States*, 272 F.Supp. 888, 891 (W.D.Wash.1967), *rev'd on other grounds*, 417 F.2d 670 (9th Cir. 1969). Gypsum was simply not accorded that latitude in this case.

**13.** Of course, the plaintiff need only plead his claim. The magic legal words "holdover tenan-

cy" were certainly not necessary where the plaintiff so clearly put Schiavo's failure to surrender possession in issue. See Rule 8(f), Fed. R.Civ.P.

**14.** Judge Pollak, in fact, alluded to some possible defenses in his original opinion. 485 F.Supp. at 51.

George Hunter, to clear the debris. Hunter performed this work at a total cost of $144,500; the closing on the sale of the property to Swann was held on September 30, 1974.

450 F.Supp. at 1300.

Gypsum introduced evidence that the agreed purchase price was $1,282,895, and that representatives of Swann refused to proceed to settlement until the debris had been cleared, as was its right under the contract of sale. (App. at 849).

Moreover, Gypsum had raised the issue in its complaint, in its pretrial Proposed Findings of Fact and in its pretrial "Statement of Contested Issues":

> [Complaint, ¶] 24. By failing to remove the debris as of the date of termination of the Lease, defendant has breached its duty to surrender the premises in substantially the same condition that it was in at the time defendant took possession, reasonable wear and tear excepted. As a result of such breach, plaintiff has sustained damages in the amount of: ·
>
> . . . .
>
> (b) the loss of the use of the purchase monies under the agreement of sale with Swann from June 1, 1974, the date on which Swann was ready to settle but for the presence of the debris and scrap, to September 26, 1974, when plaintiff conveyed the leasehold property to Swann and received the purchase monies.
>
> . . . .
>
> [Proposed Finding of Fact] 58. As of June 1, 1974 Swann Oil Co. was ready,

willing and able to proceed to closing on the Agreement of Sale dated January 18, 1974, but for the debris on the leasehold property which had not been removed.

. . . .

> 61. USG, in order to complete the sale . . . to Swann Oil, was forced to undertake . . . the clearing of the leasehold property. . . . The sale of the leasehold property took place on September 26, 1974.

. . . .

> [Contested Issue] 5. Whether Schiavo is liable to United States Gypsum for damages.
>
> . . . .
>
> (c) For the loss of the use of $1,282,895 from June 1, 1974 to September 26, 1974.

Gypsum therefore did not in any sense waive the issue during the liability phase.

In any event, we think the issue should be treated in the way it was raised by Gypsum—as a damage issue. Loss-of-use is very arguably an element of the damages proximately caused by Schiavo's breach of the implied covenant, that is, its failure to clear the debris. Gypsum's complaint (¶ 24(b), *supra*) alleged exactly that.[15] Counsel for Gypsum could justifiably have assumed that the Swann Oil sale was purely a question of damages for breach of the implied covenant as to which he had *no* obligation to present evidence during the liability trial. It is perfectly clear that that was counsel's understanding, since, in the pretrial order, he had offered testimony as

---

15. Gypsum also cites § 14.6 of the Restatement (Second) of Property, *supra*, which reads as follows:

> *Liability of Holdover Tenant for Special Damages*—Except to the extent the parties to a lease validly agree otherwise, if no election is made under the rule of § 14.4, the landlord, or incoming tenant, is entitled to recover from a tenant improperly holding over after the termination of his lease for the special damages caused by the holdover which the tenant could reasonably have foreseen at the time of his holding over would

result from his conduct, and which the injured party could not reasonably have avoided, unless equitable considerations justify relieving the tenant of some or all of these damages.

Loss-of-use may be an element of damages not only for breach of the covenant but for the holdover tenancy (*i.e.*, if Swann would have refused to settle for part of the summer because of the subtenants), a question which the district court may wish to consider on remand if liability for the holdover is established.

■■■■■■■■■■■■

to the "cost of delay [in clearing the debris] to United States Gypsum in loss of use of funds from June 1, 1974 to September 26, 1974" under the caption "Plaintiff's Witnesses-Damages." In fact, Judge Fogel at one point indicated that the issue was one of damages while a witness from Swann Oil was testifying. (App. at 848–9).

Equally important is that Judge Fogel might well have entered a finding on loss-of-use if it had been germane to his holding on the lease-related issues. As it was, his finding that the implied covenant was not breached eliminated any reason for him to consider whether there was "liability" for various damages resulting from the breach. After Judge Pollak reversed Judge Fogel's liability finding, he was obliged to consider Gypsum's timely raised claim for loss-of-use damages. We will therefore remand the loss-of-use issue to be considered in the first instance by the district court.[16]

with his earlier ruling, that the issues were *res judicata* and could not be raised in a second complaint, because they "should have been fully litigated" in the first action, *citing, Bearoff v. Bearoff Bros., Inc.*, 458 Pa. 494, 498, 327 A.2d 72, 74 (1974). One of the requirements for concluding that a matter is *res judicata* is, of course, that there be an extant final judgment from an earlier action on the matters at issue, which is unreversed on appeal. *Bearoff*, 458 Pa. at 498, 327 A.2d at 74–75. With our decision, that is no longer the case as to the first action. We will therefore vacate Judge Pollak's ruling and remand the second case to the district court so that it can decide whether to consider it or dismiss it anew on a basis other than *res judicata.*

We have considered Gypsum's arguments anent the district court's denial of prejudgment interest and its refusal to order the disbursement to Gypsum of certain escrow funds and find them to be without merit.

## VI.

### *Other Issues*

■■■■ Judge Pollak dismissed a second complaint which was filed by Gypsum after he had refused to consider holdover rent and loss-of-use in the main action. The new complaint simply renewed those two claims. Judge Pollak ruled, in accordance

## VII.

### *Conclusion*

We will affirm the district court's judgment in part and reverse it in part, and we will remand both cases for further proceedings, consistent with this opinion, on the plaintiff's claims for holdover rent and loss of use of purchase monies.[17]

16. As our discussion indicates one of our disagreements with Judge Pollak is our view that the claims for holdover rent and loss-of-use are distinct, and in fact flow from two different alleged acts of the defendant—the failure to surrender possession and the breach of the implied covenant, respectively. (But see n. (15) *supra.*) Judge Pollak viewed them as unitary. 485 F.Supp. at 51. Nevertheless, our discussion of the *nature* of the claims is not intended to be a commentary on their merits. For example, significant issues remain with respect to the loss-of-use claim. Even if the presence of *the debris was the cause of Swann's refusal to settle*—an issue which the district court will decide on remand—there remains the question of whether Schiavo should be required to pay for the harm resulting to Gypsum. Normally, "where the breach [of contract] by the defendant has prevented the use and operation of property by the plaintiff from which use profits would probably have been made, the damages

to be recovered may be measured by [rental value] . . . or by interest on the reasonable value of the property as an investment." 5 Corbin on Contracts § 1029, at 177 (footnotes omitted). Interestingly, however, the Restatement (Second) of Property, § 12.2(2)—the subsection dealing with remedies for breach of the implied covenant at issue—omits any mention of the recoverability of "special" damages for breach of the covenant. See, especially, Comment i. Compare *Id.* § 14.6 (special damages recoverable for holdover tenancy). The district court must decide on remand whether the courts of Pennsylvania would permit recovery of loss-of-use damages on whatever facts it finds.

17. This case has now occasioned hundreds of pages of briefing and at least six different fairly lengthy written opinions in two different courts. Something about this saga of landlord

and tenant seems to have caused the tiny segment of the legal community that has dealt with it—both lawyers and judges—to discuss it at extraordinary length. It is time, however, to bring this litigation to a close, and we urge the parties that in view of this opinion they first explore a prompt negotiated resolution of their

remaining differences before this protracted litigation is continued.

